**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION**

| | | |
|---|---|---|
| **LEONORA RANGEL, individually, and** | § | |
| **On behalf of the Estate of** | § | |
| **TONY MARTINEZ,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 5:23-cv-128** |
| | § | |
| **WELLPATH, LLC,** | § | |
| **GEMMA VOLPATO,** | § | |
| **KIMM HASTEY, and** | § | |
| **LUBBOCK COUNTY, TEXAS,** | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

> Since at least 1989, it has been clearly established that officials may be held liable for their acts or omissions that result in a detainee's suicide if they had subjective knowledge of a substantial risk of harm to a pretrial detainee but responded with deliberate indifference to that risk.
>
> *Converse v. City of Kemah, Texas*, 961 F.3d 771, 775 (5th Cir. 2020)

1

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW, LEONORA RANGEL, individually and on behalf of the estate of TONY MARTINEZ, Plaintiff, complaining of WELLPATH, LLC, GEMMA VOLPATO, KIMM HASTEY, and LUBBOCK COUNTY, TEXAS, and for causes of action will respectfully show unto the Court as follows:

<u>**SUMMARY**</u>

Lubbock County, Texas and the medical providers caring for the inmates in the Lubbock County Jail all have a duty under the Fourteenth Amendment to protect pretrial detainees from a known risk of suicide.

In 2021, Lubbock County had contracted with Wellpath, LLC to provide mental health care to people incarcerated in the Lubbock County Jail. Wellpath employed Gemma Volpato and Kimm Hastey to provide that mental health care.

Tony Martinez was a twenty-eight-year-old man who died on June 19, 2021, after hanging himself in the Lubbock County Jail, following Tony's removal from suicide watch two days prior. Tony was removed from suicide watch despite clear indicators, such as hallucinations telling him to hang himself, that he was a serious risk of suicide. Tony was then denied medical housing and instead housed with access to a ligature and a tie off point, in the exact same cell another inmate hung himself using a ligature and tie off point previously in the Lubbock County Jail.

Plaintiff now files this lawsuit against Wellpath, LLC, Gemma Volpato, Kimm Hastey, and Lubbock County, Texas for the wrongful death of Tony, for violating Tony's constitutional rights under the Fourteenth Amendment to the United States Constitution to be adequately monitored and protected as a pre-trial detainee from the known risk of suicide, and for violation of the Americans with Disabilities Act.

2

# I.
# Parties

1.      Plaintiff Leonora Rangel is the surviving mother of Tony Martinez and resides in Lubbock County, Texas.

2.      Defendant Wellpath, LLC is a Delaware corporation with its headquarters and principal place of business located in Tennessee. This Court may exercise personal jurisdiction over Wellpath because its employees at the Lubbock County Jail committed acts and omissions within the scope of their employment that gave rise to this cause of action. Wellpath may be served with process through their registered agent Corporate Creations Network, Inc., 2425 W. Loop South #200, Houston, TX 77027.

3.      Defendant Gemma Volpato is an individual residing in Lubbock County, Texas, and at all times relevant to this lawsuit was a private LPC-Associate that worked for Wellpath, LLC at the Lubbock County Jail through an independent contractor relationship, and may be served at her current employer, StarCare Specialty Health System, who now provides mental health services at the Lubbock County Jail, which is located at 3502 N Holly St, Lubbock, TX 79403, or wherever she may be found. Defendant Volpato is being sued in her individual capacity.

4.      Defendant Kimm Hastey is an individual residing in Lubbock County, Texas, and at all times relevant to this lawsuit was the Mental Health Coordinator and supervisor over Defendant Volpato, that worked for Wellpath, LLC at the Lubbock County Jail through an independent contractor relationship, and may be served at her current employer, Better Pathways, which is located at 405 50th St, Lubbock, Texas 79404, or wherever she may be found. Defendant Hastey is being sued in her individual capacity.

5.      Defendant Lubbock County, Texas is a political subdivision of the State of Texas located in the Northern District of Texas. Defendant Lubbock County, Texas can be served through

its County Judge, Curtis Parish, at 904 Broadway St Suite 101, Lubbock, TX 79401, or wherever he may be found.

## II.
## Jurisdiction and Venue

6.     The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343 since Plaintiff is suing for relief under 42 U.S.C. § 1983.

7.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391 because the Defendants are domiciled and/or reside in the Northern District of Texas, and all of the causes of action accrued in the Northern District of Texas in Lubbock County, Texas.

## III.
## Facts and Allegations

8.     Tony Martinez, (hereinafter referred to as "Tony") was a twenty-eight-year-old man who died on June 19, 2021, after hanging himself in the Lubbock County Jail, after being housed with access to a ligature and a tie off point in the same cell another inmate hung themselves using a ligature and tie off point, following Tony's removal from suicide watch two days prior.

9.     Lubbock County operated the Lubbock County Jail and owed a constitutional duty to the people incarcerated in their jail to protect them from the known risk of suicide.

10.     Lubbock County contracted with Wellpath, LLC (hereinafter referred to as "Wellpath"), a private medical provider, to provide mental health care to people incarcerated in the Lubbock County Jail.

11.     Lubbock County delegated policymaking authority to Wellpath regarding the medical policies, practices, and procedures in the Lubbock County Jail, including mental health care.

12.     Wellpath employed Gemma Volpato and Kimm Hastey to provide mental health care to people incarcerated in the Lubbock County Jail.

13.     Hastey was the Mental Health Coordinator at all relevant times to this lawsuit.

14.     Volpato was a newly licensed mental health professional.

15.     Hastey was responsible for supervising Volpato.

16.     Tony's preventable death occurred due to Wellpath's policies at the Lubbock County Jail, of (1) using inexperienced mental health professionals, such as Volpato who had only been licensed for three months and employed by Wellpath for one month to handle a complicated and complex case such as Tony's where he suffered from serious and rapidly declining mental health issues and exhibited dangerous suicidal behavior, (2) Failure to transport inmates, such as Tony who Wellpath understood it was incapable of providing adequate treatment, to a mental health facility or hospital where the inmate would receive adequate mental health treatment, (3) Failure to follow up with inmates such as Tony, who continued to exhibit ongoing mental health deterioration and repeated suicidal behavior, after those inmates were discharged from suicide watch, (4) taking inmates at their word when they claim not to have suicidal ideations, when their conduct clearly contradicts what is being said, (5) failing to supervise and train inexperienced mental health professionals such as Volpato when caring for a patient such as Tony, where he suffered from serious and rapidly declining mental health issues and exhibited dangerous suicidal behavior, (6) having a custom and practice of failing to properly conduct Columbia-Suicide Severity Rating Scale (C-SSRS) assessments on suicidal inmates, resulting in their discharge from suicide watch and their access to cells with ligatures and tie off points, and (7) having a policy that mental health personnel are not at the jail after hours and on the weekends – which is exactly when Tony hung himself.

5

17.     Tony's preventable death occurred due to Lubbock County's policies at the Lubbock County Jail under Sheriff Kelly Rowe, of (1) Failing to transport inmates, such as Tony who Lubbock County understood it and Wellpath – the County's mental health provider in the jail – were both incapable of providing adequate treatment, to a mental health facility or hospital where the inmate would receive adequate mental health treatment, (2) Failing to house Tony in a cell without obvious tie off points like the shower head and ligatures like the blanket he easily ripped and used as a ligature in this case, and (3) failing to ensure mental health personnel are working at the jail after hours and on the weekends – which is exactly when Tony hung himself – to provide mental healthcare to individuals like Tony who suffer from a mental health disability.

18.     At all times relevant to this lawsuit, Zachariah was held as a pre-trial detainee in the Victoria County Jail.

19.     People in the custody of the Lubbock County Jail are dependent upon the County, their employees, and the medical providers contracted by the County to protect them from risks of serious harm, including suicide.

20.     The Fifth Circuit has repeatedly held that pretrial detainees have a Fourteenth Amendment right to be protected from a known risk of suicide. *Converse v. City of Kemah, Texas*, 961 F.3d 771, 775 (5th Cir. 2020); *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 (5th Cir. 2000); *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996).

21.     And it is well-settled law that jail officials violate this right if "they had gained actual knowledge of the substantial risk of suicide and responded with deliberate indifference." *Converse*, 961 F.3d at 775 *Hare*, 74 F.3d at 650; *Jacobs*, 228 F.3d at 393.

22.     As the Fifth Circuit stated, "[w]e have never held, and we will not now suggest, that multiple suicides must occur in the same cell before a jail official is required to take preventative measures." *Converse*, 961 F.3d 771, 777 (5th Cir. 2020).

23.     However, in this case, Tony attempted multiple suicides before ultimately being successful only after being removed from suicide watch and placed in a cell with a blanket he could use as a ligature and a tie off point in his shower – in the exact same cell where a previous inmate hung themselves.

24.     Tony's mental health progressively worsened as he began to experience hallucinations compelling him to kill himself – which Gemma Volpato and Kimm Hastey were aware of these hallucinations before discharging him from suicide watch and only days before he ultimately committed suicide after being discharged from that suicide watch.

**Tony Displayed Mental Health Issues and Suicidal Behavior Upon Entry into the Jail**

January 9, 2021

25.     On January 9, 2021, Tony was booked into the Lubbock County Jail.

26.     That day, he was placed on suicide watch after telling the security staff that he wanted to hurt himself and was suicidal and then slamming his head repeatedly on the concrete floor. Tony was moved to violent cell, issued a suicide prevention gown, and placed on 15-minute observations.

27.     Tony also reported past suicide attempts.

28.     He was referred to Wellpath for mental health services in the jail.

29.     A screening was conducted, and it was determined that Tony had multiple documented mental health diagnosis requiring him to be referred to a magistrate judge for further evaluation under Texas law.

<u>January 10, 2021</u>

30.     On January 10, 2021, Tony self-reported feelings of hopelessness and a sense of being a burden to others.

<u>January 12, 2021</u>

31.     On January 12, 2021, Wellpath employee Kimberley Hastey conducted a suicide watch assessment on Tony.

32.     Wellpath employee Hastey marked that Tony denied having suicidal ideations and then discontinued his suicide watch and his violent cell restriction.

33.     The C-SRRS assessment requires the mental health professional determining whether a person should be housed on suicide watch to ask questions about their behaviors and thoughts in the past month.

34.     The first question is, "Have you wished you were dead or wished you could go to sleep and not wake up?"

35.     The second question is, "Have you actually had any thoughts of killing yourself?"

36.     If the answer to question 2 is Yes, the mental health professional is to ask the following questions:

   a.   Question 3: Have you been thinking about how you might kill yourself?

   b.   Questions 4: Have you had these thoughts and had some intention of acting on them?

   c.   Question 5: Have you started to work out or worked out the details of how to kill yourself? Do you intend to carry out this plan?

   d.   Question 6: Have you ever done anything, started to do anything, or prepared to do anything to end your life?

8

37.     Hastey incorrectly conducted the C-SRRS assessment by marking "no" to questions 1 and 2 despite the clear facts known to Hastey were that those answers were true.

38.     Accordingly, Hastey should have asked questions 3-6, but only asked question 6 and marked "yes".

39.     Because the C-SRRS was not done correctly, the determination of suicidal ideation was made in error.

40.     This was a practice and custom of Wellpath employees to incorrectly answer the first two questions as "no" so that they could skip questions 3-5 and fine that the patient, in this case Tony, did not have suicidal ideations – when the facts, statements, and behaviors clearly contradicted those answers.

41.     Wellpath employee Hastey discontinued the suicide watch despite noting Tony's risk factors of having prior suicide attempts.

42.     Wellpath employee Hastey marked the plan for Tony to be discharged from suicide watch and for follow up to occur according to Wellpath policy.

43.     Later that same day, Tony was placed back on suicide watch by security staff.

44.     Tony self-harmed himself by stabbing himself in the head with a spork until his hands and face were covered with blood, Tony reported stabbing himself 34 times.

45.     Tony also ingested two cups worth of alpha cleaning solution in an attempt to poison himself.

46.     He was placed on suicide watch, issued a suicide prevention gown, and placed on 15-minute observations.

<u>January 14, 2021</u>

47.     On January 14, 2021, Wellpath employee Hastey conducted an assessment.

48.     Wellpath employee Hastey marked that Tony denied having suicidal ideations and then discontinued his suicide watch and his violent cell restriction.

49.     The C-SRRS assessment requires the mental health professional determining whether a person should be housed on suicide watch to ask questions about their behaviors and thoughts in the past month.

50.     The first question is, "Have you wished you were dead or wished you could go to sleep and not wake up?"

51.     The second question is, "Have you actually had any thoughts of killing yourself?"

52.     If the answer to question 2 is Yes, the mental health professional is to ask the following questions:

    a.  Question 3: Have you been thinking about how you might kill yourself?

    b.  Questions 4: Have you had these thoughts and had some intention of acting on them?

    c.  Question 5: Have you started to work out or worked out the details of how to kill yourself? Do you intend to carry out this plan?

    d.  Question 6: Have you ever done anything, started to do anything, or prepared to do anything to end your life?

53.     Hastey incorrectly conducted the C-SRRS assessment by marking "no" to questions 1 and 2 despite the clear facts known to Hastey were that those answers were true.

54.     Accordingly, Hastey should have asked questions 3-6, but only asked question 6 and marked "yes".

55.     Because the C-SRRS was not done correctly, the determination of suicidal ideation was made in error.

56.     This was a practice and custom of Wellpath employees to incorrectly answer the first two questions as "no" so that they could skip questions 3-5 and fine that the patient, in this case Tony, did not have suicidal ideations – when the facts, statements, and behaviors clearly contradicted those answers.

57.     Wellpath employee Hastey discontinued the suicide watch despite noting that Tony was not compliant with his medications, had last self-harmed himself only two days prior, and had risk factors of being impulsive and having prior suicide watch placement in the jail.

58.     Wellpath employee Hastey marked the plan for Tony to be discharged from suicide watch and to for follow up to occur according to Wellpath policy.

59.     This was despite noting that Tony had been diagnosed with schizoaffective disorder: depressive type, which presents the person with an increased risk of suicide.

<u>January 26, 2021</u>

60.     On January 26, 2021, Wellpath employee Hastey conducted the first post suicide follow up on Tony according to Wellpath policy.

61.     Wellpath employee Hastey marked on the form that it had been 7 days since Tony's discharge from suicide watch, but it had actually been 12 days since she discharged Tony from suicide watch on January 14, 2021.

62.     Wellpath employee Hastey marked the plan for Tony was simply to follow up with him "PRN" (as needed) or through sick calls.

63.     This was despite noting that Tony had been diagnosed with schizoaffective disorder: depressive type, which presents the person with an increased risk of suicide.

<u>February 1, 2021</u>

64.     On February 1, 2021, Tony was placed on suicide watch by security staff after he stabbed himself in the head with a pencil until he was bleeding.

65.     He was placed on suicide watch, issued a suicide prevention gown, and placed on 15-minute observations.

<u>February 2, 2021</u>

66.     On February 2, 2021, Wellpath Employee Hastey discontinued Tony's suicide watch after noting that he denied having suicidal ideations, despite noting risk factors of Tony being impulsive and having prior suicide watch placement in the jail.

67.     The C-SRRS assessment requires the mental health professional determining whether a person should be housed on suicide watch to ask questions about their behaviors and thoughts in the past month.

68.     The first question is, "Have you wished you were dead or wished you could go to sleep and not wake up?"

69.     The second question is, "Have you actually had any thoughts of killing yourself?"

70.     If the answer to question 2 is Yes, the mental health professional is to ask the following questions:

 a.  Question 3: Have you been thinking about how you might kill yourself?

 b.  Questions 4: Have you had these thoughts and had some intention of acting on them?

 c.  Question 5: Have you started to work out or worked out the details of how to kill yourself? Do you intend to carry out this plan?

 d.  Question 6: Have you ever done anything, started to do anything, or prepared to do anything to end your life?

71.     Hastey incorrectly conducted the C-SRRS assessment by marking "no" to questions 1 and 2 despite the clear facts known to Hastey were that those answers were true.

72.     Accordingly, Hastey should have asked questions 3-6, but only asked question 6 and marked "yes".

73.     Because the C-SRRS was not done correctly, the determination of suicidal ideation was made in error.

74.     This was a practice and custom of Wellpath employees to incorrectly answer the first two questions as "no" so that they could skip questions 3-5 and fine that the patient, in this case Tony, did not have suicidal ideations – when the facts, statements, and behaviors clearly contradicted those answers.

75.     Strangely, Wellpath Employee Hastey also noted that Tony had no mental health symptoms – despite stabbing himself in the head with a pencil the day before.

76.     This was despite noting that Tony had been diagnosed with schizoaffective disorder: depressive type, which presents the person with an increased risk of suicide.

77.     However, Wellpath Employee Hasty did refer Tony to see Wellpath mental health provider Donna Moore.

February 10, 2021

78.     On February 10, 2021, Tony was placed on suicide watch by security staff after he stated he felt like he needed to stab himself in the head and was tired of everything.

79.     He was placed on suicide watch, issued a suicide prevention gown, and placed on 15-minute observations.

<u>February 12, 2021</u>

80.    On February 12, 2021, Wellpath Employee Hastey discontinued Tony's suicide watch after noting that he denied having suicidal ideations, despite noting risk factors of Tony being impulsive and having prior suicide watch placement in the jail.

81.    The C-SRRS assessment requires the mental health professional determining whether a person should be housed on suicide watch to ask questions about their behaviors and thoughts in the past month.

82.    The first question is, "Have you wished you were dead or wished you could go to sleep and not wake up?"

83.    The second question is, "Have you actually had any thoughts of killing yourself?"

84.    If the answer to question 2 is Yes, the mental health professional is to ask the following questions:

a.    Question 3: Have you been thinking about how you might kill yourself?

b.    Questions 4: Have you had these thoughts and had some intention of acting on them?

c.    Question 5: Have you started to work out or worked out the details of how to kill yourself? Do you intend to carry out this plan?

d.    Question 6: Have you ever done anything, started to do anything, or prepared to do anything to end your life?

85.    Hastey incorrectly conducted the C-SRRS assessment by marking "no" to questions 1 and 2 despite the clear facts known to Hastey were that those answers were true.

86.    Accordingly, Hastey should have asked questions 3-6, but only asked question 6 and marked "yes".

87.     Because the C-SRRS was not done correctly, the determination of suicidal ideation was made in error.

88.     This was a practice and custom of Wellpath employees to incorrectly answer the first two questions as "no" so that they could skip questions 3-5 and fine that the patient, in this case Tony, did not have suicidal ideations – when the facts, statements, and behaviors clearly contradicted those answers.

89.     Wellpath employee Hastey marked the plan for Tony to be discharged from suicide watch and to for follow up to occur according to Wellpath policy.

90.     This was despite noting that Tony had been diagnosed with schizoaffective disorder: depressive type, which presents the person with an increased risk of suicide.

<u>February 19, 2021</u>

91.     On February 19, 2021, Tony was placed on Suicide watch because he self-harmed himself just before midnight on February 18, 2021.

92.     Tony stabbed it and stabbed himself in the head in multiple spots and arm until he was bloody.

93.     He was placed on suicide watch, issued a suicide prevention gown, and placed on 15-minute observations.

94.     Later that day, Tony put in request for mental health services "to speak with mental health about meds"

95.     Wellpath personnel responded: "will be addressed when seen in VC"

96.     Upon information and belief "VC" means violent cell.

<u>February 20, 2021</u>

97.     On February 20, 2021 at 2:04 PM, a suicide watch check was performed by Wellpath employee M. Miles, an EMT-B who is not trained or licensed in providing mental health care.

98.     The form used by Wellpath employee Miles states: "This form is used for after-hours/weekend checks by Nursing when Mental Health is not on site."

99.     February 20, 2021 was a Saturday.

100.    Wellpath and Lubbock County policy was not to have trained and licensed mental health staff at the Lubbock County jail "after hours" or on weekends, despite inmates such as Tony being housed in the jail "after hours" and on weekends who may need mental health services on those days.

<u>February 21, 2021</u>

101.    On February 21, 2021, a suicide watch check was performed again by Wellpath employee Miles, who is not trained or licensed in providing mental health care.

102.    February 21, 2021 was a Sunday.

103.    Again, Wellpath and Lubbock County policy was not to have trained and licensed mental health staff at the Lubbock County jail "after hours" or on weekends, despite inmates such as Tony being housed in the jail "after hours" and on weekends who may need mental health services on those days.

**<u>Wellpath Chose Cost Reduction Over Quality of Care for Tony's Mental Health Care</u>**

104.    Defendant Gemma Volpato began working for Wellpath in January of 2021.

105.    Defendant Volpato received her first licensure from the state of Texas as a Licensed Professional Counselor Associate (LPC-Associate) on November 20, 2020.

106.    The title of LPC-Associate in the state of Texas used to be LPC-Intern.

107.    This is because an LPC-Associate (formerly intern) is a temporary licensure which requires the licensee to work under the supervision of a more experienced licensed professional.

108.    According to Defendant Volpato's LinkedIn page, in the months prior to beginning her employment with Wellpath in January of 2021, she was a part time office assistant at the Texas Tech University Health Sciences Center who conducted the following work-related tasks:

   a.   Assist with Student Travel.

   b.   Assist with all Student Government Association events, Student Life events, and Student Organization events including event shopping and pick up.

   c.   Maintain Synergistic Center.

   d.   Communicate with students to provide support and meet their needs.

   e.   Develop strong administrative skills through answering phone calls and operating the front desk.

   f.   Maintains Bulletin Boards.

109.    None of these tasks involved determining if someone diagnosed with schizoaffective disorder: depressive type who had just exhibited suicidal behavior should be discontinued from suicide watch.

110.    Her prior employment also included working part-time for Family Counseling Services where she "Counseled individual clients and couples on issues related to anxiety, depression, substance abuse, grief, and infidelity using person-centered approach and CBT

techniques" as well as "[a]ttended; co-lead various group-counseling classes including anger management and domestic violence."

111.    Again, none of these tasks involved determining if someone diagnosed with schizoaffective disorder: depressive type who had just exhibited suicidal behavior should be discontinued from suicide watch.

112.    The closest related experience – and only because of the location of the internship – that Defendant Volpato had prior to beginning her employment in January 2021 with Wellpath was when she interned at the Lubbock County Detention Center from April 2019 to March 2020 where she, "Counseled individual inmate clients in a maximum-security facility on issues related to shame, forgiveness, anxiety, depression, and substance abuse" and "Co-lead a Women's Empowerment group counseling class available to the female inmates."

113.    However, again, none of these tasks involved determining if someone diagnosed with schizoaffective disorder: depressive type who had just exhibited suicidal behavior should be discontinued from suicide watch.

114.    Despite her lack of experience, her temporary licensure as an LPC-Associate (formerly LPC-Intern) which she only obtained on November 20, 2022 and which required that she work under the supervision of a licensed mental health professional, and the serious nature of evaluating suicidal inmates where the consequences of ignoring signs of suicidal behavior can be fatal, Wellpath placed Defendant Volpato in charge of deciding when inmates who have already been placed on suicide watch, such as Tony in this case, should be removed from suicide watch and placed into a cell with access to ligatures and tie off points.

115.    It is well known that entry level employment out of school is compensated at a lower rate than those with full licensures and years of experience.

116.    The reasonable conclusion in this case is that Defendant Volpato, as an LPC-Associate, was compensated at a lower rate than an LPC or other mental health professional with more experience and without the title of "Associate."

117.    Upon information and belief, Wellpath chose to employ Defendant Volpato and tasked her with the responsibility of determining whether inmates such as Tony should remain or be discharged from suicide watch as a way to save money, by paying a lower compensation for that employee's role.

118.    This falls in line with Wellpath's and Lubbock County's decision not to pay mental health staff to remain at the jail "after hours" or on weekends, despite the clear and obvious need for such personnel at all times in the jail.

119.    Further evidence of Wellpath's attempt to reduce costs is the fact that Wellpath at no point sent Tony to an offsite mental health facility which was better suited to housing and providing him care.

120.    Wellpath's cost saving measures, colloquially known as its "Cost Containment Program" have been called into question in numerous lawsuits around the nation.

121.    According to a CNN investigation, internal documents and emails, medical records, autopsy reports, audits, interviews with more than 50 current and former employees and scathing correspondence from government clients show that amid a focus on **"cost containment"** and massive corporate growth, the company has provided substandard care that has led to deaths and other serious outcomes that could have been avoided. Please Help Me Before it is Too Late, by Blake    Ellis    and    Melanie    Hicken,    CNN,    Published    June    25,    2019 https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/, last accessed June 16, 2023.

**Wellpath Employee Gemma Volpato Takes Over Tony's Mental Health Care**

122.     Despite only being licensed since November 20, 2022, and only starting her employment in January of 2021, Defendant Volpato took over the mental health care of Tony in the Lubbock County Jail and began discharging Tony from suicide watch despite numerous signs of a serious risk of suicide in February of 2021.

### February 22, 2021

123.     On February 22, 2021, Defendant Volpato – one month after being hired and only three months after being licensed as an LPC-Associate – met with Tony while he was being held on suicide watch for stabbing and hitting himself in the head multiple times until he became bloody only three days prior on February 19, 2021.

124.     Defendant Volpato discontinued Tony's suicide watch finding he denied any suicidal ideations, despite noting that he last self-harmed on February 19, 2021, and she scaled him a 2 on his intent to harm himself.

125.     The C-SRRS assessment requires the mental health professional determining whether a person should be housed on suicide watch to ask questions about their behaviors and thoughts in the past month.

126.     The first question is, "Have you wished you were dead or wished you could go to sleep and not wake up?"

127.     The second question is, "Have you actually had any thoughts of killing yourself?"

128.     If the answer to question 2 is Yes, the mental health professional is to ask the following questions:

    a.   Question 3: Have you been thinking about how you might kill yourself?

    b.   Questions 4: Have you had these thoughts and had some intention of acting on them?

    c.   Question 5: Have you started to work out or worked out the details of how to kill yourself? Do you intend to carry out this plan?

    d.   Question 6: Have you ever done anything, started to do anything, or prepared to do anything to end your life?

129.    Volpato incorrectly conducted the C-SRRS assessment by marking "no" to questions 1 and 2 despite the clear facts known to Hastey were that those answers were true.

130.    Accordingly, Volpato should have asked questions 3-6, but only asked question 6 and marked "yes".

131.    Because the C-SRRS was not done correctly, the determination of suicidal ideation was made in error.

132.    This was a practice and custom of Wellpath employees to incorrectly answer the first two questions as "no" so that they could skip questions 3-5 and fine that the patient, in this case Tony, did not have suicidal ideations – when the facts, statements, and behaviors clearly contradicted those answers.

133.    Defendant Volpato noted that he was not having any hallucinations but that he had been diagnosed with schizoaffective disorder: depressive type, which presents the person with an increased risk of suicide.

134.    Defendant Volpato marked the plan for Tony to be discharged from suicide watch and for follow up to occur according to Wellpath policy.

<u>March 28, 2021</u>

135.   On March 28, 2021, Tony put in a request for mental health services "to speak with d anna about meds"

136.   Upon information and belief, Tony was requesting to speak with Deanna Sills, a Wellpath employee.

137.   Tony's request was received by health services by M. M. the following day on March 29, 2021.

138.   Upon information and belief, M.M. are the initials for Wellpath employee M. Miles, EMT-B.

139.   Medical personnel Deanna Sills signed the form on April 8, 2021 – over a week after it was received by health services on March 29, 2021.

<u>April 8, 2021</u>

140.   On April 8, 2021, Deanna Sills signed a Mental Health Structured Progress Note stating that Tony was refusing to get up for his sick call.

141.   Refusing to interact with others is a sign of depression, especially in someone like Tony who had been diagnosed with schizoaffective disorder: depressive type.

<u>April 10, 2021</u>

142.   On April 10, 2021, it was noted that Tony was refusing his morning medication showing he was non-compliant with medication that was supposed to be treating his diagnosis of schizoaffective disorder: depressive type.

<u>April 16, 2021</u>

143.    On April 16, 2021, Tony was placed on suicide watch in regular observation cell at 4:44 PM by security due to Tony making self-harming statements.

144.    Tony was allowed to keep his county issued uniform and mattress but was placed on 15-minute observations.

145.    However, later that day at 6:00 PM Tony was moved to a violent cell to continue his suicide watch after he was hitting his head on the cell door window and would not stop when instructed.

146.    He was issued a suicide prevention gown and placed on 15-minute observations.

<u>April 17, 2021</u>

147.    On April 17, 2021, a suicide watch check was performed by Wellpath employee Eric Benson, RN, who is not trained or licensed in providing mental health care.

148.    April 17, 2021 was a Saturday.

149.    Again, Wellpath and Lubbock County policy was not to have trained and licensed mental health staff at the Lubbock County jail "after hours" or on weekends, despite inmates such as Tony being housed in the jail "after hours" and on weekends who may need mental health services on those days.

150.    Wellpath employee Benson noted that Tony was not taking one of his medications.

<u>April 18, 2021</u>

151.    On April 18, 2021, a suicide watch check was performed by Wellpath employee A. Trevino, LVN, who is not trained or licensed in providing mental health care.

152.    April 18, 2021 was a Sunday.

153.     Again, Wellpath and Lubbock County policy was not to have trained and licensed mental health staff at the Lubbock County jail "after hours" or on weekends, despite inmates such as Tony being housed in the jail "after hours" and on weekends who may need mental health services on those days.

154.     Wellpath employee Trevino noted that Tony was not taking one of his medications.

<u>April 19, 2021</u>

155.     On April 19, 2021, Defendant Volpato met with Tony while he was being held on suicide watch for striking his head multiple times against his cell door only three days prior on April 16, 2021.

156.     Defendant Volpato was aware due to her employment with Wellpath that the Wellpath policy was not to have mental health personnel at the jail over the weekend.

157.     Thus, Defendant Volpato was aware that Tony had not been seen or followed up by a mental health professional over the weekend.

158.     Defendant Volpato discontinued Tony's suicide watch finding he denied any suicidal ideations and scaling him a 1 on his intent to harm himself.

159.     The C-SRRS assessment requires the mental health professional determining whether a person should be housed on suicide watch to ask questions about their behaviors and thoughts in the past month.

160.     The first question is, "Have you wished you were dead or wished you could go to sleep and not wake up?"

161.     The second question is, "Have you actually had any thoughts of killing yourself?"

162.     If the answer to question 2 is Yes, the mental health professional is to ask the following questions:

    a.   Question 3: Have you been thinking about how you might kill yourself?

    b.   Questions 4: Have you had these thoughts and had some intention of acting on them?

    c.   Question 5: Have you started to work out or worked out the details of how to kill yourself? Do you intend to carry out this plan?

    d.   Question 6: Have you ever done anything, started to do anything, or prepared to do anything to end your life?

163.    Volpato incorrectly conducted the C-SRRS assessment by marking "no" to questions 1 and 2 despite the clear facts known to Hastey were that those answers were true.

164.    Accordingly, Volpato should have asked questions 3-6, but only asked question 6 and marked "yes".

165.    Because the C-SRRS was not done correctly, the determination of suicidal ideation was made in error.

166.    This was a practice and custom of Wellpath employees to incorrectly answer the first two questions as "no" so that they could skip questions 3-5 and fine that the patient, in this case Tony, did not have suicidal ideations – when the facts, statements, and behaviors clearly contradicted those answers.

167.    Defendant Volpato noted that he was not having any hallucinations or mental health symptoms but that he had been diagnosed with schizoaffective disorder: depressive type, which presents the person with an increased risk of suicide.

168.    Defendant Volpato did not even note the fact that Tony had been striking his head against his cell door on April 16, 2021.

169.    Curiously, Defendant Volpato marked the date of Tony's last self-harm incident was "unknown" and he had no concerning behaviors, despite the fact that she had access to the incident reports which showed Tony self-harmed on April 16, 2021 and she noted on her February 22, 2021 assessment form that Tony had self-harmed on February 19, 2021 – which was why he was on suicide watch when she saw him on February 22, 2021.

170.    But then further down the form Defendant Volpato wrote that Tony had self-harmed "2 months ago" with regard to the questions of "Have you ever done anything, started to do anything, or prepared to do anything to end your life? If yes, how long ago did you do any of these?"

171.    Defendant Volpato marked the plan for Tony to be discharged from suicide watch and for follow up to occur according to Wellpath policy.

<u>May 2, 2021</u>

172.    On May 2, 2021, it was noted that Tony was refusing his morning medication.

173.    Later that day, Tony was placed on suicide watch by security staff after he began striking his head on a brick wall.

174.    Tony was issued a suicide prevention gown and placed on 15-minute observations.

<u>May 4, 2021</u>

175.    Then on May 4, 2021, Defendant Volpato again discontinued Tony's suicide watch and violent cell restriction noting that Tony denied suicidal ideations and "stated a 1 on intent."

176.    The C-SRRS assessment requires the mental health professional determining whether a person should be housed on suicide watch to ask questions about their behaviors and thoughts in the past month.

26

177.   The first question is, "Have you wished you were dead or wished you could go to sleep and not wake up?"

178.   The second question is, "Have you actually had any thoughts of killing yourself?"

179.   If the answer to question 2 is Yes, the mental health professional is to ask the following questions:

    a.   Question 3: Have you been thinking about how you might kill yourself?

    b.   Questions 4: Have you had these thoughts and had some intention of acting on them?

    c.   Question 5: Have you started to work out or worked out the details of how to kill yourself? Do you intend to carry out this plan?

    d.   Question 6: Have you ever done anything, started to do anything, or prepared to do anything to end your life?

180.   Volpato incorrectly conducted the C-SRRS assessment by marking "no" to questions 1 and 2 despite the clear facts known to Hastey were that those answers were true.

181.   Accordingly, Volpato should have asked questions 3-6, but only asked question 6 and marked "yes".

182.   Because the C-SRRS was not done correctly, the determination of suicidal ideation was made in error.

183.   This was a practice and custom of Wellpath employees to incorrectly answer the first two questions as "no" so that they could skip questions 3-5 and fine that the patient, in this case Tony, did not have suicidal ideations – when the facts, statements, and behaviors clearly contradicted those answers.

184.    Defendant Volpato noted that Tony had been hitting his head on a wall on May 2, 2021 and his self-harming behavior was concerning, but note he did not have any mental health symptoms or hallucinations.

185.    This was despite noting that Tony had been diagnosed with schizoaffective disorder: depressive type, which presents the person with an increased risk of suicide.

186.    However, Defendant Volpato found it necessary to refer Tony to Wellpath mental health provider Moore – a licensed Physician's Assistant.

187.    Defendant Volpato marked the plan for Tony to be discharged from suicide watch and for follow up to occur according to Wellpath policy.

188.    Later that day, Wellpath employee D. Moore, PA, met with Tony for a Progress Note.

189.    Wellpath employee Moore noted the following on her form:

    a.   Tony was depressed

    b.   Tony denies delusions

    c.   She put a question mark over the word paranoid and wrote "none currently"

    d.   Under Self injuries, she wrote "denies now"

    e.   Under Hallucinations: she wrote "none currently" and circled auditory

    f.   Under Impulsivity: she circled controlled but wrote "now but was banging his head"

    g.   Under Danger to self/others: she marked no but wrote "denies currently"

190.    Wellpath employee Moore was noting what Tony told her – but these responses were clearly contradicted by his actions of self-harm. This would cause a reasonable mental health

professional to question his answers about his suicidal ideations and not just take them at face value.

May 6, 2021

191.    On May 6, 2021 at 10:20 AM, Defendant Volpato met with Tony to conduct a post suicide watch release follow up.

192.    Defendant Volpato marked on her form that it had been one day since his discharge from suicide watch, but it was actually two days since Defendant Volpato discharged Tony from suicide watch on May 4, 2021.

193.    Defendant Volpato noted that "inmate swallowed a bottle cap on purpose in front of me" (emphasis added)

194.    Defendant Volpato recommend violent cell housing "to ensure inmate safety".

195.    However, Defendant Volpato also marked that Tony did not have any suicidal ideations or mental health symptoms.

196.    Defendant Volpato marked that Tony did not have suicidal ideation or mental health symptoms despite noting that she watched him swallow a bottle cap in front of her and recommended a violent cell to ensure his safety.

197.    A reasonable mental health professional would not have marked that Tony did not have suicidal ideations or mental health symptoms while at the same time noting they watched him swallow a bottle cap and were recommending a violent cell for to ensure his safety.

198.    Upon information and belief, Defendant Volpato was simply marking that there were no suicidal ideations on each of these assessment forms even when she was aware of facts that put her on notice that Tony did in fact have suicidal ideations and presented as a serious risk of suicide.

29

199.    Fascinatingly, security officers noted in numerous incident reports that later that day, they found Tony choking with his face red in color near the showers in the pod.

200.    The security officers noted in their reports that Tony stated he swallowed a bottle cap and was scared to die.

201.    Officer Cesar Mejorado noted in his narrative that "Inmate Martinez had just visited with Mental Health Gemma Volpato prior to him choking."

202.    Inmate Carrizales was doing the Heimlich maneuver and Officer Mejorado was patting Martinez on the back.

203.    Sergeant Christopher Martinez made the decision to "rehouse Inmate Martinez in a violent cell to keep a closer watch on him."

204.    These reports indicate that Defendant Volpato witnessed Tony swallow the bottle cap and did nothing to help him as the officers found him choking after just having met with Defendant Volpato.

205.    There is also no mention in the reports of Defendant Volpato being present during the choking – to the contrary Officer Mejorado stated that "Inmate Martinez had just visited with Mental Health Gemma Volpato prior to him choking." (emphasis added).

206.    This means that either Defendant Volpato did not witness Tony swallow the bottle cap and fabricated that on her form – calling into question everything else she states in her forms, or, Defendant Volpato did witness Tony swallow the bottle cap but did nothing to help him and even still noted that he did not have suicidal ideations or mental health symptoms – calling into question everything else she states in her forms.

207. Sergeant Christopher Martinez stated in his narrative that after making the decision to rehouse Tony in a violent cell to keep a closer watch on him, Mental Health personnel Donna Moore evaluated Tony and stated she would make some adjustments to his medication.

208. At 10:45AM – roughly twenty minutes after Tony was found choking following his meeting with Defendant Volpato, Tony met with Wellpath employee Donna Moore, as indicated by Sergeant Martinez's narrative.

209. Astonishingly, Wellpath employee Moore did not even mention in her notes that Tony had just swallowed a bottle cap.

210. Instead, Wellpath employee Moore stated that Tony had been banging his head on the wall.

211. While this type of self-harming conduct had happened multiple times in the jail, that was not the reason Tony was seeing Wellpath employee Moore that day.

212. This complete lack of attention to the facts in front of her calls into question everything else being marked on her assessment forms and shows a pattern with the Wellpath mental health personnel of including things that aren't true on their forms – such as Defendant Volpato stating that Tony did not have suicidal ideations or mental health symptoms earlier that day despite also writing that she watched him swallow a bottle cap in front of her.

213. In this progress note, Wellpath employee Moore marked the following:

    a.   Tony was depressed

    b.   Tony was angry

    c.   Tony's Affect was flat and restricted

    d.   Tony's thought content was paranoid

    e.   Tony denied suicidal ideations

  f. Under Self Injurious she wrote "denies"

  g. Under Insight she wrote "poor/fair"

  h. Tony's Memory was marked as impaired

  i. Under Danger to self/others she marked no and wrote "denies"

214. Again, Wellpath employee Moore was noting what Tony told her – but these responses were clearly contradicted by his actions of self-harm FROM THAT DAY. This would cause a reasonable mental health professional to question his answers about his suicidal ideations and not just take them at face value.

215. Following his meeting with Wellpath employee Moore that day, and while waiting for his violent cell to be cleaned, Tony made statements to the security officers that he was going to get the officers to kill him by kicking them and getting them to break his neck.

216. These statements were memorialized in the officers' narrative reports.

<u>May 7, 2021</u>

217. On May 7, 2021, Defendant Volpato again discontinued Tony's suicide watch and violent cell restriction noting that Tony denied suicidal ideations and "scaled a 1 on intent."

218. The C-SRRS assessment requires the mental health professional determining whether a person should be housed on suicide watch to ask questions about their behaviors and thoughts in the past month.

219. The first question is, "Have you wished you were dead or wished you could go to sleep and not wake up?"

220. The second question is, "Have you actually had any thoughts of killing yourself?"

221. If the answer to question 2 is Yes, the mental health professional is to ask the following questions:

    a.   Question 3: Have you been thinking about how you might kill yourself?

    b.   Questions 4: Have you had these thoughts and had some intention of acting on them?

    c.   Question 5: Have you started to work out or worked out the details of how to kill yourself? Do you intend to carry out this plan?

    d.   Question 6: Have you ever done anything, started to do anything, or prepared to do anything to end your life?

222.    Volpato incorrectly conducted the C-SRRS assessment by marking "no" to questions 1 and 2 despite the clear facts known to Hastey were that those answers were true.

223.    Accordingly, Volpato should have asked questions 3-6, but only asked question 6 and marked "yes".

224.    Because the C-SRRS was not done correctly, the determination of suicidal ideation was made in error.

225.    This was a practice and custom of Wellpath employees to incorrectly answer the first two questions as "no" so that they could skip questions 3-5 and fine that the patient, in this case Tony, did not have suicidal ideations – when the facts, statements, and behaviors clearly contradicted those answers.

226.    Defendant Volpato discontinued Tony' suicide watch despite marking that his estimated current self-harm/suicide risk was "Intermediate."

227.    This was the first time that she marked anything other than "Low", yet still discharged him from suicide watch and discontinued his violent cell restriction.

228.    She did this despite noting that his self-harming behavior was concerning and that he self-harmed the prior day by swallowing a bottle cap.

229.    Defendant Volpato also mentioned his behavior with the security officers the prior day after meeting with Wellpath employee Moore where he became aggressive with the intent of them killing him in response.

230.    Defendant Volpato knew about his behavior with the security officers from her access to the reports which discussed his intentions of having the officers kill him.

231.    Defendant Volpato also noted that Tony did not have any mental health symptoms despite trying to kill himself the day before and being diagnosed with schizoaffective disorder: depressive type, which presents the person with an increased risk of suicide.

232.    Defendant Volpato marked the plan for Tony to be discharged from suicide watch and for follow up to occur according to Wellpath policy.

<u>May 10, 2021</u>

233.    On May 10, 2021, Defendant Volpato conducted a Post Suicide Watch Release Follow-up – three days since she discharged Tony from suicide watch.

234.    This post suicide watch release follow up was being done according to Wellpath policy and was the plan as indicated by Defendant Volpato on her May 7, 2021 form.

235.    Accordingly, the Wellpath policy was for there to be no follow up for a suicidal inmate, like Tony, recently taken off suicide watch for three days.

236.    This was in part because Wellpath and Lubbock County policy was not to have trained and licensed mental health staff at the Lubbock County jail "after hours" or on weekends, despite inmates such as Tony being housed in the jail "after hours" and on weekends who may need mental health services on those days.

237.    May 7, 2021, the day Defendant Volpato discharged Tony from suicide watch, was a Friday.

34

238.    Pursuant to Wellpath policy, there were no mental health personnel to do a follow up on May 8, 2021 – a Saturday.

239.    Pursuant to Wellpath policy, there were no mental health personnel to do a follow up on May 9, 2021 – a Sunday.

240.    May 10, 2021, when the follow up occurred, was a Monday.

241.    This means Tony was placed on suicide watch on May 6, 2021 for suicidal behavior, removed on May 7, 2021 by Defendant Volpato, and then not seen by any mental health professional until May 10, 2021 when Wellpath mental health personnel returned to the jail after the weekend.

242.    Defendant Volpato noted that Tony did not have suicidal ideations or mental health symptoms.

243.    Defendant Volpato then marked the plan was to follow up on Tony in five days on May 15, 2021.

244.    This follow-up was being done according to Wellpath policy.

245.    This means that Tony, a recently suicidal inmate would not be followed up with for five days.

246.    However, May 15, 2021 was a Saturday.

247.    Because the Wellpath and Lubbock County policy was not to have trained and licensed mental health staff at the Lubbock County jail "after hours" or on weekends, Tony would not be followed up with on May 15, 2021 as planned.

248.    Later that day, Tony was taken to medical for swallowing the cap to his shampoo bottle, indicating he was in fact still suicidal and had the intent to self-harm.

<u>May 18, 2021</u>

249.    On May 18, 2021, Defendant Volpato conducted another post suicide watch release follow up.

250.    The plan from the May 10, 2021 follow up was to again see Tony in five days – which would have been May 15, 2021.

251.    However, because of the Wellpath policy not to have mental health personnel at the jail during the weekends, and May 15, 2021 was a Saturday, Tony was not seen according to the plan.

252.    Instead, Tony was seen eight days later on May 18, 2021.

253.    Interestingly, the form has the date of the follow up written as May 17, 2021 and scratched out to read May 18, 2021. The blank on the form for the number of days since discharge also reads "5x" and then has a "7" written next to it.

254.    Upon information and belief, the form had already been partially filled out indicating the follow up would occur on Monday May 17, 2021 – but for some reason was not completed until Tuesday May 18, 2021.

255.    Upon information and belief, the pre-filled form was marked with "5x" indicating there had been five days since the last follow up – but was then marked with a "7" indicating the follow up didn't happen until Monday May 17, 2021 (since according to Wellpath policy there was no mental health personnel at the jail at the five-day mark on Saturday May 15, 2021).

256.    These pre and partially filled out forms are further evidence that the information on them should no be taken at face value and Defendant Valpoto knew facts indicating Tony was a risk of suicide despite her continually noting he had no suicidal ideations or mental health symptoms.

257.    On the form, Defendant Volpato noted that Tony "keeps swallowing bottlecaps".

258.    Defendant Volpato again noted that Tony had no suicidal ideations or mental health issues.

259.    Defendant Volpato then marked the follow up plan to be in seven days on May 25, 2021.

260.    This follow-up plan was being done according to the Wellpath policy.

261.    This means that Tony was not going to be seen by a mental health professional for seven days, despite Defendant Volpato writing that Tony "keeps swallowing bottlecaps".

262.    Because the Wellpath policy was not to have mental health professionals at the jail over the weekend, two of the seven days that Tony was not going to be seen by a mental health professional were also days where there was no mental health professional on site even if he needed one.

<u>May 23, 2021</u>

263.    On May 23, 2021, just before midnight, five days since last being followed up with by Defendant Volpato and five days since he had seen anyone with mental health at the jail, Tony swallowed a spork (eating utensil that is round like a spoon but has sharp prongs at the end like a fork).

264.    Tony also stated, "I'm trying to kill myself."

265.    Tony's airway was partially obstructed, he had blood-streaked saliva and his face was red.

266.    Tony had to be transported to the emergency room at the hospital by EMS for evaluation.

<u>May 25, 2021</u>

267.    On May 25, 2021, Defendant Volpato met with Tony for another post suicide watch release follow up seven days since the last follow up on May 18, 2021.

268.    Defendant Volpato noted that Tony "swallowed a fork and was sent to hospital" but then found Tony had no suicidal ideations.

269.    However, Defendant Volpato then wrote that Tony refused to get up to come to the door of his cell to see her and refused to answer the rest of the assessment questions.

270.    Despite this, Tony was not placed on suicide watch.

271.    Instead, no follow up was scheduled and the plan was simply for mental health to follow up PRN (as needed) or through sick call.

272.    A reasonable mental health professional would have understood the refusal to answer assessment questions as a basis to place an individual on suicide watch, however, Defendant Volpato, aware that Tony had just returned from the emergency room for trying to kill himself by swallowing a spork and who was now refusing to answer assessment questions, simply left Tony in his cell and didn't even schedule an additional follow up.

273.    Upon information and belief, Defendant Volpato was acting according to Wellpath policy.

274.    That same day, Lt. Lopez at the jail put in place security measures stating that Tony was "allowed only a mattress, towel, mattress cover and bible ONLY. In addition, Inmate Martinez is on a PPT with NO eating utencil."

275.    It was clear to a non-mental health professional that Tony needed to be on restrictions due to his serious risk of suicide.

276.     However, Defendant Volpato deliberately ignored the obvious facts indicating Tony was a suicide risk as she had done the entire time she was responsible for his mental health care.

<u>May 27, 2021</u>

277.     On May 27, 2021, it was noted that Tony was refusing to go to the medical unit and instead just wanted to sleep.

278.     This was a red flag of depression, especially in someone who has been diagnosed with schizoaffective disorder: depressive type.

279.     That same day, Wellpath employee Moore met with Tony to complete a progress note.

280.     Wellpath employee Moore noted on the form that Tony was taken to "UMC to remove a crayon, tried to eat spork".

281.     This indicates that Wellpath employee Moore was aware that Tony had recently in the previous couple of days been taken to the emergency room for a suicide attempt.

282.     On the progress note, Wellpath employee Moore marked:

   a.   Tony "denies current depression"

   b.   Tony "denies current" hallucinations

   c.   She circled "none evidence" for delusions

   d.   Marked that Tony denies suicidal ideations

   e.   Under Self Injurious she wrote "denies"

   f.   Under Insight she wrote "poor"

   g.   Under Impulsivity she circled "controlled"

    h.   Under Danger to self/others she drew a question mark over "yes" but marked the answer as "no"

    i.   Under the Assessment section she wrote "recently psychotic and suicidal (swallowed crayon)" however left out that he swallowed the spork.

<u>June 4, 2021</u>

283.    On June 4, 2021, Tony stated to security officers over the intercom in his cell, "I am feeling suicidal and I want to hurt myself."

284.    According to Officer Michael Soto's narrative, Tony spoke with Mental Health staff Volpato after being moved to Cell MC-15 for observation and placed on suicide watch.

285.    That day Defendant Volpato met with Tony.

286.    Defendant Volpato noted that Tony told her he was banging his head.

287.    The nurse who saw Tony noted that he had a "peanut-sized nodule on left parietal area" from hitting head on door

288.    Defendant Volpato noted that, "Inmate admitted to suicidal ideations and self-harm behavior."

289.    Defendant Volpato recommended suicide watch in an observation cell.

290.    Defendant Volpato then referred Tony to Wellpath mental health provider Moore.

291.    That same day, Wellpath employee Moore met with Tony to complete a progress note.

292.    Wellpath employee Moore wrote that Tony was "feeling suicidal" and "depressed, tired of being in jail."

293.    Wellpath employee Moore marked on the progress note:

    a.   Under Target symptoms: she wrote "suicidal ideation"

   b.   Marked that his Mood was depressed

   c.   Marked his Affect was negative, flat, restricted

   d.   She wrote "denies" above paranoid

   e.   Under Delusions she circled none evidence

   f.   Under Hallucinations she circled auditory

   g.   Under Ideation she marked Suicidal with plan

   h.   Under Self injurious she marked Yes and wrote "swallowing objects"

   i.   Under Insight she wrote "poor"

   j.   Under Danger to self/others she checked yes and wrote: "self report"

   k.   Under Assessment she wrote "depressed, doesn't want to live"

   l.   Under Diagnosis she wrote "Schizoaffective, Depressive"

294.   It was clear to Defendant Volpato and Wellpath employee Moore that Tony's suicidal behavior, ideations, and intent had progressed to a dangerous level.

295.   However, June 4, 2021 was a Friday.

296.   Accordingly, Wellpath policy not to have mental health personnel at the jail over the weekend meant that Tony would not be seen or even have access to mental health professionals for the next two days.

<u>June 5, 2021</u>

297.   June 5, 2021 was a Saturday.

298.   On June 5, 2021, when no mental health professionals were at the jail pursuant to Wellpath policy, Tony refused to eat breakfast or drink water.

299.   These were signs that he was in serious mental health decline, but no mental health professionals were at the jail to see these signs.

<u>June 6, 2021</u>

300.    June 6, 2021 was a Sunday.

301.    On June 6, 2021, when no mental health professionals were at the jail pursuant to Wellpath policy, Carol Young, RN, who is not trained or licensed in providing mental health care, completed a suicide watch check form.

302.    Nurse Young marked the following:

a.   Future oriented: no

b.   Sad/depressed: yes

c.   Reporting feelings of hopelessness: yes

d.   Reporting sense of being a burden to others: yes

e.   Reporting negative court or family related news: yes

303.    These were all signs associated with the serious risk of suicide, but no mental health professional was at the jail pursuant to the Wellpath and Lubbock County policy not to have mental health personnel at the jail after hours or on weekends.

<u>June 7, 2021</u>

304.    On June 7, 2021, Defendant Volpato discontinued Tony' suicide watch and violent cell restriction finding Tony did not have suicidal ideation and that Tony was a "1 on intent".

305.    The C-SRRS assessment requires the mental health professional determining whether a person should be housed on suicide watch to ask questions about their behaviors and thoughts in the past month.

306.    The first question is, "Have you wished you were dead or wished you could go to sleep and not wake up?"

307.    The second question is, "Have you actually had any thoughts of killing yourself?"

308.     If the answer to question 2 is Yes, the mental health professional is to ask the following questions:

    a.  Question 3: Have you been thinking about how you might kill yourself?

    b.  Questions 4: Have you had these thoughts and had some intention of acting on them?

    c.  Question 5: Have you started to work out or worked out the details of how to kill yourself? Do you intend to carry out this plan?

    d.  Question 6: Have you ever done anything, started to do anything, or prepared to do anything to end your life?

309.     Volpato incorrectly conducted the C-SRRS assessment by marking "no" to questions 1 and 2 despite the clear facts known to Hastey were that those answers were true.

310.     Accordingly, Volpato should have asked questions 3-6, but only asked question 6 and inexplicably marked "no".

311.     Because the C-SRRS was not done correctly, the determination of suicidal ideation was made in error.

312.     This was a practice and custom of Wellpath employees to incorrectly answer the first two questions as "no" so that they could skip questions 3-5 and fine that the patient, in this case Tony, did not have suicidal ideations – when the facts, statements, and behaviors clearly contradicted those answers.

313.     Defendant Volpato discontinued the suicide watch despite noting that Tony's risk factors included Hopelessness, feelings of guilt or worthlessness as well as prior suicide watch placement in the jail.

314.     Defendant Volpato also noted that Tony's behavior was withdrawn.

315.    Defendant Volpato noted that Tony did not have any mental health symptoms despite him stating he was feeling suicidal on June 4, 2021 and banging his head that same day and his behavior was withdrawn, and he was hopeless, and had feelings of guilt or worthlessness.

316.    Defendant Volpato then marked the plan for Tony to be discharged from suicide watch and for follow up to occur according to Wellpath policy.

### June 9, 2021

317.    On June 9, 2021, Tony stated he had intentions of self-harming himself.

318.    Tony stated he was hearing voices telling him to inflict self-harm on himself.

319.    Tony explained he was going to "bang his head" on the walls.

320.    Tony was placed on suicide watch, issued a suicide gown, and placed on 15-minute observations.

### June 10, 2021

321.    On June 10, 2021 at 850 AM, Defendant Volpato met with Tony and discontinued his suicide watch and observation cell restriction finding that he did not have suicidal ideations and was a "1 on intent".

322.    The C-SRRS assessment requires the mental health professional determining whether a person should be housed on suicide watch to ask questions about their behaviors and thoughts in the past month.

323.    The first question is, "Have you wished you were dead or wished you could go to sleep and not wake up?"

324.    The second question is, "Have you actually had any thoughts of killing yourself?"

325.    If the answer to question 2 is Yes, the mental health professional is to ask the following questions:

    a.   Question 3: Have you been thinking about how you might kill yourself?

    b.   Questions 4: Have you had these thoughts and had some intention of acting on them?

    c.   Question 5: Have you started to work out or worked out the details of how to kill yourself? Do you intend to carry out this plan?

    d.   Question 6: Have you ever done anything, started to do anything, or prepared to do anything to end your life?

326.    Volpato incorrectly conducted the C-SRRS assessment by marking "no" to questions 1 and 2 despite the clear facts known to Hastey were that those answers were true.

327.    Accordingly, Volpato should have asked questions 3-6, but only asked question 6 and marked "yes".

328.    Because the C-SRRS was not done correctly, the determination of suicidal ideation was made in error.

329.    This was a practice and custom of Wellpath employees to incorrectly answer the first two questions as "no" so that they could skip questions 3-5 and fine that the patient, in this case Tony, did not have suicidal ideations – when the facts, statements, and behaviors clearly contradicted those answers.

330.     This is despite the fact that Defendant Volpato noted on the form that the reason Tony was placed on suicide watch the previous day was because he was stating he was hearing voices telling him to harm himself and he was going to bang his head on the walls.

331.    Defendant Volpato wrote that Tony did not have any reported hallucinations on June 10, 2021 and no mental health symptoms that day.

332.    Defendant Volpato also changed Tony's diagnosis from schizoaffective disorder: depression type to schizoaffective disorder: bipolar type. It is correct to diagnose someone with both types of schizoaffective disorder.

333.    Defendant Volpato initially wrote "referral" but then crossed that out and wrote "DC SW/OC" meaning discontinue suicide watch and observation cell.

334.    This shows that Defendant Volpato did think he needed to be kept on suicide watch and referred to a mental health provider but then decided to discontinue the suicide watch ignoring the facts known to her at the time that supported Tony being a serious risk of suicide.

335.    Defendant Volpato also noted that Tony "hasnt had morning meds since beginning of May" and wrote that she confirmed this.

336.    Thus, Defendant Volpato now had information that Tony was experiencing hallucinations telling him to harm himself and had not been taking his medication for over a month and she still discontinued his suicide watch.

337.    Defendant Volpato also wrote "inmate reports not remembering when" regarding previous suicidal behavior. Defendant Volpato knew that Tony had engaged in suicidal behavior in the previous weeks.

338.    Shockingly, Defendant Volpato wrote that the date of the last self-harm incident was unknown and Tony had no behaviors of concern.

339.    Defendant Volpato knew this not to be true as she was well aware of his concerning suicidal behavior from each of the times she met with him and discharged him from suicide watch.

340.    Later that day at 6:20 PM, Tony tied a piece of torn blanket around his neck. Security Staff placed him in a cell in the booking area and placed him on suicide watch.

341.    This occurred eight hours after Defendant Volpato marked that Tony did not have suicidal ideations, despite being aware of that he was a real risk of suicide.

342.    June 10, 2021 was a Thursday.

343.    Tony would not be seen by mental health personnel until the following week because of Wellpath's and Lubbock County's policy not to have mental health personnel at the jail on the weekend or after hours.

<u>June 14, 2021</u>

344.    Tony was not seen until June 14, 2021.

345.    Tony was seen by Defendant Volpato on June 14, 2021 – four days after being placed on suicide watch when he was found with a blanket tied around his neck.

346.    Defendant Volpato noted that Tony had tied a piece of blanket around his neck, and that Tony was experiencing hallucinations telling him "to hang self and hurt self bad on June 10, 2021.

347.    Defendant Volpato also noted that Tony reported anxiety and depression.

348.    Shockingly, but somehow not surprisingly, Defendant Volpato discontinued Tony from suicide watch and removed his violent cell restriction, finding that Tony did not have suicidal ideations and "scaled 1 on intent" with "no plan reported".

349.    The C-SRRS assessment requires the mental health professional determining whether a person should be housed on suicide watch to ask questions about their behaviors and thoughts in the past month.

47

350.    The first question is, "Have you wished you were dead or wished you could go to sleep and not wake up?"

351.    The second question is, "Have you actually had any thoughts of killing yourself?"

352.    If the answer to question 2 is Yes, the mental health professional is to ask the following questions:

    a.    Question 3: Have you been thinking about how you might kill yourself?

    b.    Questions 4: Have you had these thoughts and had some intention of acting on them?

    c.    Question 5: Have you started to work out or worked out the details of how to kill yourself? Do you intend to carry out this plan?

    d.    Question 6: Have you ever done anything, started to do anything, or prepared to do anything to end your life?

353.    Volpato incorrectly conducted the C-SRRS assessment by marking "no" to questions 1 and 2 despite the clear facts known to Hastey were that those answers were true.

354.    Accordingly, Volpato should have asked questions 3-6, but only asked question 6 and marked "yes".

355.    Because the C-SRRS was not done correctly, the determination of suicidal ideation was made in error.

356.    This was a practice and custom of Wellpath employees to incorrectly answer the first two questions as "no" so that they could skip questions 3-5 and fine that the patient, in this case Tony, did not have suicidal ideations – when the facts, statements, and behaviors clearly contradicted those answers.

357.    Defendant Volpato wrote that no plan was reported despite Tony being on suicide watch after tying a piece of blanket around his neck – demonstrating a clear plan to hang himself.

358.    Defendant Volpato marked that Tony presented an intermediate level of current self-harm/suicide risk – up from the standard level of "Low" that she usually marked for Tony.

359.    Yet, she still removed him from suicide watch and his violent cell restriction.

360.    Additionally, she noted that he had concerning self-harm behavior.

361.    Defendant Volpato also marked that his affect was blunted and his thought content was hallucinations.

362.    She referred Tony to Wellpath employee Moore.

363.    Additionally, under the section of "Patient has identified the following reasons for living" Defendant Volpato wrote, "inmate reported no people, meaningful actions, dreams/aspirations, or religious beliefs"

364.    No reasonable medical professional would have removed Tony from suicide watch or the violent cell with all of this information.

365.    However, Defendant Volpato did.

366.    Defendant Volpato marked the plan for Tony to be discharged from suicide watch and for follow up to occur according to Wellpath policy.

367.    Later on June 14, 2021, Donna Moore added abilify to Tony's morning medications.

368.    On the referral to Donna Moore, it stated,

    a.  "referral sent via email to D. Moore" and

     b.  "Inmate reports anxiety & depression and au/vh [auditory and visual hallucinations] **telling him to hang himself** and hurt himself bad Requests medications in the morning." (emphasis added)

369.    On the Mental Health – Psych Referral it states, Seen by: Kimm Hastey – Mental Health Coordinator, MS, LPC, LSOTP; Deanna Sills – Mental Health Nurse, LVN; Gemma Volpato – M-Ed, LPC-Associate.

370.    This indicates that all three of Kimm Hastey, Deanna Sills, and Gemma Volpato were seeing Tony as a mental health team.

371.    Defendant Volpato was an LPC-Associate that required supervision.

372.    Kimm Hastey was the Mental Health Coordinator and LPC supervising Defendant Volpato.

373.    Kimm Hastey failed to supervise Defendant Volpato when she failed to take action regarding Tony's increasing level of suicidal behavior noted in Defendant Volpato's assessments.

<u>June 15, 2021</u>

374.    On June 15, 2021, Defendant Volpato did a post suicide watch release follow up with Tony – one day after his discharge from suicide watch on June 14, 2021.

375.    Defendant Volpato wrote that Tony was still hearing voices, but bafflingly wrote no mental health symptoms reported.

376.    Defendant Volpato checked a box stating Tony was having hallucinations.

377.    Defendant Volpato wrote that Tony was complaining about his inability to sleep and Defendant Volpato responded "advised that sleep is not treated in this facility."

378.     The inability to sleep while hearing voices telling someone to kill themselves while also diagnosed with schizoaffective disorder (of either type) would have put a reasonable mental health professional on notice that Tony was a serious risk of suicide.

379.     This information put Defendant Volpato on notice that Tony was a serious risk of suicide.

380.     This information put Defendant Hastey – who was supervising Defendant Volpato – on notice that Tony was a serious risk of suicide.

381.     However, Defendant Hastey allowed Defendant Volpato to keep Tony off of suicide watch.

382.     Defendant Volpato listed the plan to be a mental health follow up in 5 days on June 20, 2021.

383.     June 20, 2021 was Sunday.

384.     Pursuant to Wellpath policy no mental health professionals would be at the jail on June 20, 2021, thus the follow up would have had to occur on June 21, 2021.

<u>June 16, 2021</u>

385.     On June 16, 2021, at approximately 1100, Inmate Tony Martinez, housed in 3A-102, pressed the intercom button and stated, "I can't do it anymore, I'm feeling suicidal".

386.     Defendant Volpato arrived to the cell to speak with Tony.

387.     Tony was placed on suicide watch in a violent cell, issued a suicide gown, and placed on 15-minute observations.

388.     Defendant Volpato noted that  "Inmate admitted to active suicide ideations. Inmate scaled a **<u>9 on intent</u>** with 1 being he's not going to harm himself and 10 being he's going to kill himself today. Inmate denied having a plan to harm himself." (emphasis added)

389.    Defendant Volpato recommended suicide watch in a violent cell to ensure Tony'
safety.

390.    Suicide watch is not treatment and continuing to place Tony on suicide watch was
doing nothing to make him better.

391.    Defendant Volpato noted on her form that the reason for the visit was "call over
radio for suicidal inmate"

    a.   She listed Tony' s mood as irritable.

    b.   She listed his thought Content as Hallucinations

    c.   She marked that Tony was experiencing Suicidal Ideations.

    d.   However, oddly, the time that she found Tony to be experiencing suicidal ideations,
       she did not complete a C-SSRS.

    e.   Defendant Volpato wrote the following:

       i.   Auditory hallucinations present

      ii.   No plan reported

     iii.   Inmate reported no self harm

     **iv.   Scaled 9 on intent**

    f.   Defendant Volpato wrote, "inmate stated he just cant take it anymore and his
       thoughts/mind is weak. Recommend VC/SW"

<u>June 17, 2021</u>

392.    Then, on June 17, 2021, Defendant Volpato met with Tony and inexplicably
discontinued his suicide watch and violent cell restriction.

393.    The C-SRRS assessment requires the mental health professional determining whether a person should be housed on suicide watch to ask questions about their behaviors and thoughts in the past month.

394.    The first question is, "Have you wished you were dead or wished you could go to sleep and not wake up?"

395.    The second question is, "Have you actually had any thoughts of killing yourself?"

396.    If the answer to question 2 is Yes, the mental health professional is to ask the following questions:

    a.    Question 3: Have you been thinking about how you might kill yourself?

    b.    Questions 4: Have you had these thoughts and had some intention of acting on them?

    c.    Question 5: Have you started to work out or worked out the details of how to kill yourself? Do you intend to carry out this plan?

    d.    Question 6: Have you ever done anything, started to do anything, or prepared to do anything to end your life?

397.    Volpato incorrectly conducted the C-SRRS assessment by marking "no" to questions 1 and 2 despite the clear facts known to Hastey were that those answers were true.

398.    Accordingly, Volpato should have asked questions 3-6, but only asked question 6 and marked "yes".

399.    Because the C-SRRS was not done correctly, the determination of suicidal ideation was made in error.

400.    This was a practice and custom of Wellpath employees to incorrectly answer the first two questions as "no" so that they could skip questions 3-5 and fine that the patient, in this

case Tony, did not have suicidal ideations – when the facts, statements, and behaviors clearly contradicted those answers.

401.   Defendant Volpato marked the following:

   a.   Mood: Depressed

   b.   Affect: Blunted

   c.   Behavior: Withdrawn

   d.   No suicidal ideation

   e.   Date of last self harm incident: "**unknown**"

   f.   Behaviors of concern: "**None**"

   g.   "no plan reported"

   h.   "**scaled 2 on intent**"

   i.   Risk Factors:

        i.   Hopelessness, feeling of guilt or worthlessness

402.   Defendant Volpato also noted that Tony was refused medical housing.

403.   Defendant Volpato noted that they "discussed coping skills"

404.   Tony had deteriorated past the point of discussing coping skills. While this may have been what Defendant Volpato did in her previous internships, Tony required and deserved more care.

405.   The serious nature of Tony's downward spiral would have had Defendant Hastey actively involved in supervising Defendant Volpato.

406.   Defendant Hastey knew that Tony needed to be on suicide watch and in a violent cell, however, Defendant Hastey did nothing to override Defendant Volpato's decision to remove Tony from suicide watch.

407.    Defendant Volpato marked the plan for Tony to be discharged from suicide watch and for follow up to occur according to Wellpath policy.

408.    June 17, 2021 was a Thursday.

409.    Therefore, according to Wellpath policy, no mental health professionals would be at the jail on June 19, 2021 or June 20, 2021 as those days fell on a weekend.

410.    Tony was moved from the violent cell he had been in on suicide watch to cell 102 in pod 3A.

411.    This cell had a shower with shower head sticking out from the wall a few inches from the ceiling of the shower.

412.    Tony was provided a blanket that could easily be torn into strips.

<u>June 19, 2021</u>

413.    On June 19, 2021, when there were no mental health professionals at the jail and when Tony had not been followed up in two days following his removal from suicide watch, Tony killed himself.

414.    Tony tore the blanket into strips, tied them to the shower head, and hung himself.

415.    The shower head was an obvious tie off point.

416.    The blanket was an obvious ligature.

417.    Tony had previously been placed on suicide watch after tying a ligature around his neck.

**Lubbock County Staff were on Notice that Tony Needed Restrictions to Ensure His Safety**

418.     The Lubbock County Jail was on notice that Tony had previously tied a ligature around his neck necessitating suicide watch as the security staff are the ones that found him and placed him on suicide watch.

419.     Lubbock County Jail Lt. Lopez demonstrated the ability and authority to put in place security measures to keep Tony from committing suicide even when not being held on suicide watch when on May 25, 2021, Lt. Lopez put into place restrictions stating that Tony was "allowed only a mattress, towel, mattress cover and bible ONLY. In addition, Inmate Martinez is on a PPT with NO eating utencil"

420.     Accordingly, the jail staff had the ability and authority to place property restrictions on Tony to ensure his safety.

421.     The Lubbock County Jail staff were aware of Tony's suicidal behavior as he has been attempting suicide in their jail since January 9, 2021 and it was the jail staff that found him and placed him on suicide watch each time.

422.     The Lubbock County Jail staff were also aware that inmates could commit suicide by hanging in the jail as there had been at least three prior suicides by hanging in the Lubbock County Jail.

423.     On December 6, 2019, Jordan Woolf committed suicide by hanging inside of the Lubbock County Jail in Cell 1A-218, by using a ligature made from jail clothing.

424.     Mr. Woolf had exhibited mental health problems in the jail prior to his suicide.

425.     On April 28, 2020, Keegan Cloud committed suicide by hanging in Cell 3A-102 –

**THE EXACT SAME CELL WHERE TONY COMMITTED SUICIDE** – by using a ligature made from jail clothing.

426.     Upon information and belief Mr. Cloud used the shower head as the tie off point for his suicide just as Tony did, as there are no other tie off points in cell 3A-102.

427.     Upon information and belief, Mr. Cloud exhibited mental health problems in the jail prior to his suicide.

428.     On July 13, 2020, Joseph Perales committed suicide by hanging in Cell 3B-102 – the same cell in a different pod as the one Tony committed suicide – by using a ligature made from the cord to an oxgyen machine.

429.     Prior to his death, Mr. Perales had made suicidal statements in the Lubbock County Jail.

430.     These three prior instances show that both Wellpath and Lubbock County were on notice that inmates could use various items to make ligatures and then use tie off points in cells to hang themselves.

431.     Mr. Cloud's suicide put both Wellpath and Lubbock County on notice that inmates could hang themselves in the exact cell Tony committed suicide by hanging.

432.     Lubbock County had the ability and authority to house Tony in a cell without obvious tie off points and without ligatures.

433.     Lubbock County had safety blankets in the jail that could not be torn that could have been given to Tony instead of the easily tearable blanket he was provided and which he tore into strips to create the ligature to kill himself.

### Wellpath and Lubbock County Chose Not to Transfer Tony to a Mental Health Facility

434.     Both Wellpath and Lubbock County owed a duty to protect Tony from the known risk of suicide under the Fourteenth Amendment to the United States Constitution.

435.    Both Wellpath and Lubbock County were aware that the course of action they had been following was not good enough to protect Tony.

436.    Both Wellpath and Lubbock County were aware that suicide watch does nothing to treat the mental health issues from which Tony was suffering.

437.    Both Wellpath and Lubbock County were aware of mental health facilities and hospitals where Tony could be transferred where he would receive an elevated level of care and treatment that Wellpath and Lubbock County were unable to provide.

438.    However, both Wellpath and Lubbock County chose not to transfer Tony to a facility or hospital that could provide him adequate treatment and care; but instead, to continue the course of action that they both knew to be inadequate at preventing the ultimate act of suicide.

## IV.

## Causes of Action

### Count One

### FAILURE TO PROTECT
**Violation of the Fourteenth Amendment Pursuant to 42 U.S.C. § 1983**
**Defendants Volpato and Hastey**

439.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

440.    The Fifth Circuit has repeatedly held that pretrial detainees have a Fourteenth Amendment right to be protected from a known risk of suicide. *Converse*, 961 F.3d at 775; *Jacobs*, 228 F.3d at 393; *Hare*, 74 F.3d at 639.

441.    And it is well-settled law that jail officials violate this right if "they had gained actual knowledge of the substantial risk of suicide and responded with deliberate indifference." *Converse*, 961 F.3d at 775; *Hare*, 74 F.3d at 650; *Jacobs*, 228 F.3d at 393.

442.     As the Fifth Circuit stated, "[w]e have never held, and we will not now suggest, that multiple suicides must occur in the same cell before a jail official is required to take preventative measures." *Converse*, 961 F.3d 771, 777 (5th Cir. 2020).

443.     Since at least 1989, it has been clearly established that officials may be held liable for their acts or omissions that result in a detainee's suicide if they "had subjective knowledge of a substantial risk of harm to a pretrial detainee but responded with deliberate indifference to that risk." *Converse*, 961 F.3d at 775; *Jacobs*, 228 F.d at 393-94; quoting *Hare*, 74 F.3d at 650; *see also Flores v. County of Hardeman*, 124 F.3d 736, 738 (5th Cir. 1997) ("A detainee's right to adequate protection from known suicidal tendencies was clearly established when Flores committed suicide in January 1990.").

444.     A prison official will not be held liable if he merely "should have known" of a risk; instead, to satisfy this high standard, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Converse*, 961 F.3d at 775; *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

445.     An official shows a deliberate indifference to that risk "by failing to take reasonable measures to abate it." *Converse*, 961 F.3d at 775–76; *Hare II*, 74 F.3d at 648.

446.     Tony had a constitutional right to be protected from a known risk of suicide as a pretrial detainee under the Fourteenth Amendment. *Converse*, 961 F.3d at 775.

447.     Episodic acts or omissions occur where the complained-of harm is a particular act or omission of one or more officials. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 645 (5th Cir. 1996).

448.    As to the individual in an episodic-acts-or-omissions claim, the relevant question becomes "whether that official breached his constitutional duty to tend to the basic human needs of persons in his charge…" *Est. of Henson v. Wichita Cty., Tex.*, 795 F.3d 456, 463–64 (5th Cir. 2015).

449.    "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

450.    An official's actual knowledge of a substantial risk may only be inferred if the "substantial risk" was obvious. *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006).

**Defendants Volpato and Hastey were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.**

451.    There is no question that Defendants Volpato and Hastey, as medical professionals treating a pretrial detainee on behalf of a governmental entity, was acting under color of state law for purposes of § 1983. *Sanchez v. Oliver*, 995 F.3d 461, 466 (5th Cir. 2021).

452.    Defendants Volpato and Hastey were aware of and ignored obvious indicia of a risk of serious harm – including each of the facts outlined in the Facts section of this lawsuit.

453.    On June 17, 2021, Defendant Volpato met with Tony in the Lubbock County Jail and took him off suicide watch despite knowing that he was a suicide risk.

454.    Defendant Hastey was supervising Volpato and was aware that Volpato had removed Tony from suicide watch due to being the mental health coordinator and being responsible for Volpato, an LPC-Associate who had only been licensed and working at the jail for a few months.

455.     Additionally, the letter to Donna Moore regarding Tony hearing voices telling him to kill himself listed both Hastey and Volpato as medical professionals seeing Tony.

456.     Despite being aware of all this information, Defendants Volpato and Hastey removed Tony from suicide watch, knowing he would be placed into a cell with a blanket and tie off point – as neither Volpato nor Hastey indicated on the form discharging Tony from suicide watch that he needed property restrictions or a violent or observation cell.

457.     Thus, Defendants Volpato and Hastey were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. *Converse*, 961 F.3d at 775.

**Defendants Volpato and Hastey actually drew the inference.**

458.     Defendants Volpato and Hastey actually drew the inference that there was substantial risk of suicide with Zachariah due to the information outlined in the Facts section of this lawsuit.

459.     Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. *Farmer*, 511 U.S. at 842.

460.     Defendants Volpato and Hastey's actual knowledge of the substantial risk can be inferred because it was so obvious based off of the information each of them knew at the time the order to remove Tony from suicide watch was given on June 16, 2021.

461.     Thus, Defendants Volpato and Hastey actually drew the inference that a substantial risk of serious harm existed.

462.     Knowing all of this, Defendants Volpato and Hastey, as the team of mental health professionals treating Tony, shockingly directed that Tony be taken off suicide watch on March 16, 2021, where he would be moved to an isolation cell with a ligature and tie off point.

463.     Accordingly, Defendants Volpato and Hastey may be held liable for acts or omissions that resulted in Tony's suicide because of having "subjective knowledge of a substantial risk of harm to a pretrial detainee but responded with deliberate indifference to that risk" when directing and allowing Tony to be removed from suicide watch on June 16, 2021. *Converse*, 961 F.3d at 775; *Sanchez v. Oliver*, 995 F.3d 461, 475 (5th Cir. 2021); *Wynn v. Harris Cnty., Texas*, 556 F. Supp. 3d 645, 655 (S.D. Tex. 2021).

464.     Additionally, because Defendants Volpato and Hastey were private medical practitioners that worked for Wellpath, Defendants Volpato and Hastey are not entitled to assert the defense of qualified immunity. *Sanchez*, 995 F.3d at 472; *Wynn*, 556 F. Supp. 3d at, 653-54; *Cabler v. Red River Cnty., Texas*, No. 5:21CV12-RWS-CMC, 2022 WL 950886, at *18–19 (E.D. Tex. Mar. 2, 2022), *report and recommendation adopted,* No. 521CV00012RWSCMC, 2022 WL 946014 (E.D. Tex. Mar. 29, 2022).

## COUNT II

**FAILURE TO SUPERVISE**
**Violation of the Fourteenth Amendment Pursuant to 42 U.S.C. § 1983**
**Defendant Hastey**

465.     Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

466.     In a § 1983 claim for failure to supervise or train, the plaintiff must show that: "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure

to train or supervise amounts to deliberate indifference." *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir.1998).

467.    "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. (quoting *Smith*, 158 F.3d at 912.).

468.    In this case, Defendant Hastey failed to supervise Defendant Volpato.

469.    First, it is clear that Defendant Hastey was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and Defendant Hastey actually drew the inference that a substantial risk of serious harm existed as outlined in the Facts section of this lawsuit and Count I of this lawsuit and because Defendant Hastey was aware that Tony was suicidal, as Defendant Hastey was the Mental Health Coordinator at the Lubbock County Jail, Defendant Hastey was actively involved in the treatment of Tony as indicated by the email to Donna Moore listing Hastey as one of the medical providers seeing Tony, Hastey was supervising Volpato due to Volpato being a newly licensed mental health professional and Wellpath employee and was thus actively involved in overseeing Volpato's cases – especially a case as complex and complicated as Tony's.

470.    However, despite this information, Defendant Hastey permitted Defendant Volpato to remove Tony from suicide watch and a violent cell, the exact same cell where he would be placed in an isolation cell with a tie off point and ligature where another inmate hung themselves the previous year.

471.    As a result, Defendant Hastey was deliberately indifferent in failing to supervise Defendant Volpato.

472.    As a result, her failure to supervise Defendant Volpato amounted to deliberate indifference.

473.    Finally, there existed a causal link between Defendant Hastey's failure to supervise and the violation of Tony's rights. *Goodman*, 571 F.3d at 395 (quoting *Smith*, 158 F.3d at 912.).

474.    Had Defendant Hastey taken steps to ensure Defendant Volpato had provided Tony with protection from the risk of suicide by placing him on suicide watch, or by appropriately conducting the C-SRRS, Tony would not have succumb to the risk of suicide and died.

475.    Defendant Hastey's failure to supervise Defendant Volpato directly caused the harm to Tony outlined in this lawsuit.

476.    As a result, (1) Defendant Hastey failed to supervise Defendant Volpato; (2) a causal link exists between the failure to supervise and the violation of Tony's rights; and (3) the failure to supervise amounts to deliberate indifference." *Goodman*, 571 F.3d at 395 (quoting *Smith*, 158 F.3d at 911–12).

## COUNT III
## PRACTICE AND CUSTOM OF DELIBERATE INDIFFERENCE

### *Monell v. New York City Department of Social Services*
### Violation of the Fourteenth Amendment
### Pursuant to 42 U.S.C § 1983
### Defendants Lubbock County, Texas and Wellpath, LLC

477.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

478.    Municipalities and other local governments are "persons" within the meaning of Section 1983 and can therefore be held liable for violating a person's constitutional rights. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978); *Bonilla*, 982 F.3d at 308.

479.    Municipalities are, however, responsible only for "their own legal acts." *Covington v. City of Madisonville, Tex.*, 812 F. App'x 219, 225 (5th Cir. 2020) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)). They cannot be held liable on a *respondeat superior* theory solely because they employ a constitutional tortfeasor. *Monell*, 436 U.S. at 691–92.

480.    Plaintiff invokes two alternative theories of liability against Victoria County for the death of Zachariah: the "episodic acts and omissions" of County jailers, and the unconstitutional "conditions of confinement" at the County jail. *See Flores v. Cnty of Hardeman, Tex.*, 124 F.3d 736, 738 (5th Cir 1997).

481.    Plaintiff's episodic acts and omissions theory "requires a finding that particular jailers acted or failed to act with deliberate indifference to the detainee's needs" and – notably – that this conduct is attributable to the enforcement of a municipal policy, practice, or custom. *Sanchez v. Young Cnty., Tex.*, 866 F.3d 274, 279 (5th Cir. 2017).

482.    Plaintiff's conditions of confinement theory, in contrast, does not rest on the fault of individual jailers. *Id*. Rather, it challenges the conditions, practices, rules or restrictions of pretrial confinement imposed by the County that, together, "impose[] what amounts to punishment in advance of trial." *Id*.

483.    Under both theories, Plaintiff must show "(1) that a constitutional violation occurred and (2) that a municipal policy was the moving force behind the violation." *Sanchez*, 956 F.3d at 791 (quoting *Monell*, 436 U.S. at 694).

484.    The Supreme Court has held that "the medical treatment of prison inmates by prison physicians is state action." *West v. Atkins*, 487 U.S. 42, 53 (1988).

485.    Further, the Fifth Circuit has applied *Monell* liability to private prisons. *Moore v. LaSalle Mgmt. Co.*, 41 F.4th 493, 509 (5th Cir. 2022).

**Episodic Acts or Omissions Claim Against Defendant Wellpath, LLC**

486.     In an episodic acts or omissions claim against a municipality, "an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997).

487.     To hold a municipal entity liable under this standard, the plaintiff must establish: "(1) a governmental employee acted with subjective deliberate indifference; and (2) the employee's act resulted from a policy or custom adopted or maintained with objective deliberate indifference to the plaintiff's constitutional rights." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999).

488.     An official policy "usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice [of city officials or employees] that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)).

489.     Whatever its form, the policy must have been the "moving force" behind the plaintiff's constitutional violation. *Piotrowski*, 237 F.3d at 580 (quoting *Monell*, 436 U.S. at 694).

490.     Stated differently, Plaintiff "must show direct causation, i.e., that there was 'a direct causal link' between the policy and the violation." See *James*, 577 F.3d at 617 (quoting *Piotrowski*, 237 F.3d at 580).

491.    The policy must also have been "promulgated with deliberate indifference to the known or obvious consequences that constitutional violations would result." *Piotrowski*, 237 F.3d at 579 (internal quotation marks omitted).

492.    "A failure to adopt a policy rises to the level of deliberate indifference 'when it is obvious that the likely consequences of not adopting a policy will be a deprivation of civil rights.'" *Evans v. City of Marlin, Tex.*, 986 F.2d 104, 108 (5th Cir.1993) (quoting *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992)).

493.    Establishing deliberate indifference on the part of a municipality generally requires a "pattern of similar violations" arising from a policy "so clearly inadequate as to be 'obviously likely to result in a constitutional violation.'" *Burge v. Saint Tammany Par.*, 336 F.3d 363, 370 (5th Cir. 2003) (quoting *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001)). A narrow 'single incident' exception to the pattern requirement, however, has been recognized. *Id.* at 372–73; *Covington v. City of Madisonville, Tex.*, 812 F. App'x 219, 225 (5th Cir. 2020). For deliberate indifference to be based on a single incident, "it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of a particular policy." *Alvarez v. City of Brownsville*, 904 F.3d 382, 390 (5th Cir. 2018) (quoting *Burge*, 336 F.3d at 373).

494.    Each of Defendants Volpato and Hastey, despite their subjective knowledge that Tony was a suicide risk, chose not to keep Tony on suicide watch and incorrectly performed the C-SRRS assessment, resulting in Tony being housed in an isolation cell with a ligature and tie off point where he committed suicide and died, and these actions were taken as a result of Wellpath's policies and practices outlined in this lawsuit.

**Conditions of Confinement Claims Against Defendants Lubbock County and Wellpath**

495.    A challenge to a condition of confinement is a challenge to "general conditions, practices, rules, or restrictions of pretrial confinement." *Hare v. City of Corinth*, 74 F. 3d 633, 644–45 (5th Cir. 1996).

496.    The issue is whether the conditions "amount to punishment." *Bell*, 441 U.S. at 535.

497.    As has been explained, "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the government action is punishment that may not constitutionally be inflicted upon detainees.'" *Bell v. Wolfish*, 441 U.S. 520, 539 (1979); *Garza v. City of Donna*, 922 F.3d 626, 632 (5th Cir. 2019).

498.    If Defendant Lubbock County wishes to incarcerate suicidal pretrial detainees, it has a constitutional responsibility to ensure that its conditions do not amount to "punishment" in advance of trial.

499.    If Wellpath, LLC wishes to contract to provide medical care for Lubbock County at the Jail, it has accepted a constitutional responsibility to ensure that its conditions do not amount to "punishment" in advance of trial.

500.    To prove a conditions of confinement claim, the plaintiff must show (1) a rule or restriction, an intended condition or practice, or a *de facto* policy as evidenced by sufficiently extended or pervasive acts of jail officials, (2) not reasonably related to a legitimate governmental objective, and (3) that violated [the detainee's] constitutional rights. *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452, 454–55 (5th Cir. 2009).

501.    An official policy "usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice [of city officials

or employees] that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)).

502.    Whatever its form, the policy must have been the "moving force" behind the plaintiff's constitutional violation. *Piotrowski*, 237 F.3d at 580 (quoting *Monell*, 436 U.S. at 694).

503.    Stated differently, Plaintiff "must show direct causation, i.e., that there was 'a direct causal link' between the policy and the violation." See *James*, 577 F.3d at 617 (quoting *Piotrowski*, 237 F.3d at 580).

504.    The policy must also have been "promulgated with deliberate indifference to the known or obvious consequences that constitutional violations would result." *Piotrowski*, 237 F.3d at 579 (internal quotation marks omitted).

505.    "A failure to adopt a policy rises to the level of deliberate indifference 'when it is obvious that the likely consequences of not adopting a policy will be a deprivation of civil rights.'" *Evans v. City of Marlin, Tex.*, 986 F.2d 104, 108 (5th Cir.1993) (quoting *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992)).

506.    Establishing deliberate indifference on the part of a municipality generally requires a "pattern of similar violations" arising from a policy "so clearly inadequate as to be 'obviously likely to result in a constitutional violation.'" *Burge v. Saint Tammany Par.*, 336 F.3d 363, 370 (5th Cir. 2003) (quoting *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001)). A narrow 'single incident' exception to the pattern requirement, however, has been recognized. *Id*. at 372–73; *Covington v. City of Madisonville, Tex.*, 812 F. App'x 219, 225 (5th Cir. 2020).

507.    For deliberate indifference to be based on a single incident, "it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence

of a particular policy." *Alvarez v. City of Brownsville*, 904 F.3d 382, 390 (5th Cir. 2018) (quoting *Burge*, 336 F.3d at 373).

508.    As the Fifth Circuit stated, "[w]e have never held, and we will not now suggest, that multiple suicides must occur **in the same cell** before a jail official is required to take preventative measures." (emphasis added) *Converse v. City of Kemah, Texas*, 961 F.3d 771, 777 (5th Cir. 2020).

509.    In the Fifth Circuit, a conditions of confinement claim "requires no showing of specific intent on the part of the [municipality]." *Sanchez*, 866 F.3d at 279; *Edler v. Hockley Cnty. Comm'rs Ct.*, 589 F. App'x 664, 669 (5th Cir. 2014) ("[U]nlike an episodic-act-or-omission claim, a plaintiff is not required to prove deliberate indifference.").

510.    Although an unlawful condition or practice is often explicit, a "formal, written policy is not required." *Montano v. Orange Cnty., Tex.*, 842 F.3d 865, 875 (5th Cir. 2016); see *Shepherd*, 591 F.3d at 452.

511.    A condition may "reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice.'" *Shepherd*, 591 F.3d at 452 (quoting *Hare*, 74 F.3d at 645).

512.    As noted by the Fifth Circuit, "specific [prior] examples are not required to meet the 'conditions or practice' element" when there is consistent testimony of jail employees, *Montano*, 842 F.3d at 875 ("Given the striking uniformity of the jail employees' testimony, further evidence was not required for a reasonable juror to infer a *de facto* policy for conditions or practices."), or the policy maker knows about a misconduct yet fails to take remedial action, *Sanchez*, 956 F.3d at 793–94.

513.    When multiple employees act in the same unconstitutional manner, that is indicative of a *de facto* policy. *See Sanchez*, 956 F.3d at 793 (finding that evidence that the county's written policies were ignored created fact-issues as to whether the jail had a *de facto* policy of inadequately monitoring intoxicated detainees).

514.    "We do not require a plaintiff to show that a 'policy or practice [was] the exclusive cause of the constitutional deprivation.' Courts 'may . . . consider how individual policies or practices interact with one another within the larger system.'" *See Sanchez*, 956 F.3d at 791.

515.    Municipal liability may attach where the constitutional deprivation is pursuant to a governmental custom, even if such custom has not received formal approval. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 166 (5th Cir. 2010) (citing *Monell*, 436 U.S. at 690–91).

516.    A *de facto* policy can be found when none of the jailers face any reprimand after an inmate's death, or when a municipality fails to take any evident action to correct the jail's alleged deficiencies. *See Sanchez*, 956 F.3d at 793 (finding that "fail[ure] to take remedial action ... arguably shows acquiescence to the misconduct such that a jury could conclude that it represents official policy.") (citing *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) (holding that, because the city policymaker failed to change policies or to discipline or reprimand officials, the jury was entitled to conclude that the complained-of practices were "accepted as the way things are done and have been done in" that city)).

517.    The plaintiff may demonstrate a "persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Zarnow*, 614 F.3d at 168–69 (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.1984).

518.    "Under the decisions of the Supreme Court and [the Fifth Circuit], municipal liability under section 1983 requires proof of three elements: a policy maker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694).

519.    A municipality "cannot be liable for an unwritten custom unless '[a]ctual or constructive knowledge of such custom' is attributable to a city policymaker." *Pena v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (citing *Hicks–Fields v. Harris Cty.*, 860 F.3d 803, 808 (5th Cir. 2017)).

520.    To establish municipal liability under § 1983 based on an alleged "persistent widespread practice or custom that is so common it could be said to represent municipal policy, actual or constructive knowledge of such practice or custom must be shown." *Malone v. City of Fort Worth*, 297 F. Supp. 3d 645, 654 (N.D. Tex. 2018) (citing *Hicks–Fields*, 860 F.3d at 808).

521.    "Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities…" *Hicks–Fields*, 860 F.3d at 808.

522.    The Supreme Court has described an actionable *Monell* policy as "a course of action consciously chosen among various alternatives." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S. Ct. 2427, 2436, 85 L. Ed. 2d 791 (1985).

523.    A decision to adopt a particular course of conduct represents official policy even if it is not intended to govern future conduct so long as the decision was made by a final policymaker. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

524.    Where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly. *Id.*

525.    Municipal liability under § 1983 attaches where a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question. *Pembaur*, 475 U.S. at 483, 106 S. Ct. at 1300.

## POLICYMAKER

526.    The Supreme Court has stated that "there will be cases in which policymaking responsibility is shared among more than one official or body." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988).

## Wellpath, LLC

527.    Lubbock County operated the Lubbock County Jail and owed a constitutional duty to the people incarcerated in their jail to protect them from the known risk of suicide.

528.    Lubbock County contracted with Wellpath, LLC, a private medical provider, to provide mental health care to people incarcerated in the Lubbock County Jail.

529.    Lubbock County delegated policymaking authority to Wellpath regarding the medical policies, practices, and procedures in the Lubbock County Jail, including mental health care.

530.    As the Mental Health Coordinator at the Lubbock County Jail, Defendant Hastey was the policymaker for Wellpath with regard to the medical policies and practices in the Lubbock County Jail.

**Lubbock County**

531.    The identification of policymaking officials is a question of state law. *Id*. at 124.

532.    Under Texas law, sheriffs are "final policymakers" in the area of law enforcement for the purposes of holding a county liable under § 1983. *James v. Harris Cty.*, 577 F.3d 612, 617 (5th Cir. 2009); citing *Williams v. Kaufman County*, 352 F.3d 994, 1013 (5th Cir.2003).

533.    The sheriff of each county is the keeper of the county jail. The sheriff shall <u>safely</u> keep all prisoners committed to the jail by a lawful authority, subject to an order of the proper court. Tex. Loc. Gov't Code Ann. § 351.041.

534.    The sheriff has all the powers, duties, and responsibilities with regard to keeping prisoners and operating the jail that are given by law to the sheriff in a county operating its own jail. Tex. Loc. Gov't Code Ann. § 351.035.

535.    Kelly Rowe is the sheriff of Lubbock County and was the sheriff of Lubbock County at all times relevant to this lawsuit.

536.    Accordingly, Sheriff Rowe is and was the final policymaker for Lubbock County with regard to policies, practices, and customs in the Lubbock County Jail.

537.    Upon information and belief, discovery into information within the knowledge of the County will show that Sheriff Rowe promulgated, adopted, approved, and/or ratified the policies and practices discussed in this lawsuit.

538.    Upon information and belief, discovery into information within the knowledge of the County will show that Sheriff Rowe had constructive knowledge of the customs, practices, and *de facto* policies outlined in this lawsuit, as he would have known of the violations if he would have properly exercised his responsibilities…" *Hicks–Fields*, 860 F.3d at 808.

539.    Upon information and belief, discovery into information within the knowledge of the County will show that Sheriff Rowe had constructive knowledge of the customs, practices, and *de facto* policies outlined in this lawsuit, as he would have known of the violations if he would have properly exercised his responsibilities…" following each of the suicide attempts made by Tony and by other inmates in the Lubbock County Jail prior to June of 2021. *Hicks–Fields*, 860 F.3d at 808.

540.    Upon information and belief, discovery into information within the knowledge of the County will show that Sheriff Rowe failed to implement corrective or remedial customs, practices, and policies following each of the suicide attempts made by Tony and by other inmates in the Lubbock County Jail prior to June of 2021. *Sanchez*, 956 F.3d at 793–94.

541.    Here, Sheriff Rowe knowingly chose not to change policies or practices following each of the suicide attempts made by Tony and by other inmates in the Lubbock County Jail prior to June of 2021, which shows that the complained of practices were accepted as the way things are done in the Lubbock County Jail. *Sanchez*, 956 F.3d at 793–94; *Grandstaff*, 767 F.2d at 171.

### Policy, Custom, and Practice
### Which was Moving Force of Constitutional Violations

542.    The § 1983 causation component requires that the plaintiff identify, with particularity, the policies or practices they allege cause the constitutional violation, and demonstrate a "direct causal link." *M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 255 (5th Cir. 2018); *see Piotrowski*, 237 F.3d at 580.

543.    The Fifth Circuit does not, however, require the court to consider each policy or practice in a vacuum. *Id.* The court may properly consider how individual policies or practices interact with one another within the larger system and how the harmful effects of some policies are exacerbated by others. *Id.*

544.   The Supreme Court has described an actionable *Monell* policy as "a course of action consciously chosen among various alternatives." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S. Ct. 2427, 2436, 85 L. Ed. 2d 791 (1985).

545.   Sheriff Rowe, the final policymaker for Lubbock County, consciously chose each of the policies outlined in this lawsuit over various available alternatives.

546.   "A failure to adopt a policy rises to the level of deliberate indifference 'when it is obvious that the likely consequences of not adopting a policy will be a deprivation of civil rights.'" *Evans*, 986 F.2d at 108.

547.   The County's policies with regard to inmates such as Tony, who were known by the Jail staff and administration to be a serious risk of suicide as he had been placed on and off of suicide watch from January 9, 2021 until June 19, 2021 when he ultimately died, worked together to cause Tony not to be protected from himself in violation of his Fourteenth Amendment right pursuant to the United States Constitution.

548.   The Fifth Circuit has repeatedly held that pretrial detainees have a Fourteenth Amendment right to be protected from a known risk of suicide. *Converse v. City of Kemah, Texas*, 961 F.3d 771, 775 (5th Cir. 2020); *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 (5th Cir. 2000); *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996).

549.   And it is well-settled law that jail officials violate this right if "they had gained actual knowledge of the substantial risk of suicide and responded with deliberate indifference." *Converse*, 961 F.3d at 775; *Hare*, 74 F.3d at 650; *Jacobs*, 228 F.3d at 393.

550.   As the Fifth Circuit stated, "[w]e have never held, and we will not now suggest, that multiple suicides must occur **in the same cell** before a jail official is required to take preventative measures." *Converse*, 961 F.3d 771, 777 (5th Cir. 2020).

551.   Plaintiff has pleaded detailed facts above, relevant to failures to monitor and protect, which are incorporated as if set-out fully herein which support:

a.  Official policies, longstanding practices and/or customs existed at the Lubbock County Jail which were implemented by the final policymaking official for the County, Sheriff Rowe.

b.  The policymaker for the County, Sheriff Rowe, knew or should have known about the policies and/or practices and customs which created *de facto* policies at the Lubbock County Jail;

c.  The policymaker for the County, Sheriff Rowe, was deliberately indifferent in promulgating these policies and/or permitting these *de facto* policies to persist; and

d.  The County's policies and/or customs were the moving force leading to the constitutional violation of failing to protect Tony, causing his injuries and ultimately his death.

552.   Plaintiff has pleaded facts to support that the County was deliberately indifferent because they disregarded known or obvious consequence of their policies and practices. The County clearly knew of the policies and knew that these policies were likely to cause constitutional violations by way of the obvious nature of failing to provide a safe environment for inmates at an elevated risk of suicide.

553.   The County's policies and practices include each policy listed in this lawsuit, which include, but are not limited to the following policies.

(1)   Failing to transport inmates, such as Tony who Lubbock County understood it and Wellpath – the County's mental health provider in the jail – were both incapable of providing adequate treatment, to a mental health facility or hospital where the inmate would receive adequate mental health treatment,

77

(2)     Failing to house Tony in a cell without obvious tie off points like the shower head and ligatures like the blanket he easily ripped and used as a ligature in this case, and

(3)     failing to ensure mental health personnel are working at the jail after hours and on the weekends – which is exactly when Tony hung himself – to provide mental healthcare to individuals like Tony who suffer from a mental health disability.

554.    Each of the Lubbock County officers were acting pursuant to the County's deliberately indifferent policies, practices, customs, and *de facto* policies which were implemented and not revised under the supervision of Sheriff Rowe, when Tony was not transported off site to a mental health facility or hospital that could provide the adequate treatment he needed and when Tony was housed with a tie off point and ligature in the exact same cell as another inmate had committed suicide by hanging, despite displaying severe mental illness and having attempted suicide multiple times in the Lubbock County Jail.

555.    As a result of these unconstitutional policies, practices, customs, and *de facto* policies, Tony was not protected in violation of his rights pursuant to the Fourteenth Amendment to the United States Constitution and he suffered physical injury, physical pain and suffering, mental anguish and emotional distress, and died.

556.    Plaintiff has pleaded detailed facts above, relevant to failures to monitor and protect, which are incorporated as if set-out fully herein which support:

a.  Wellpath's official policies, longstanding practices and/or customs existed at the Lubbock County Jail which were implemented by the final policymaking official for Wellpath, Defendant Hastey.

b.  The policymaker for Wellpath, Defendant Hastey, knew or should have known about the policies and/or practices and customs which created *de facto* policies for Wellpath at the Lubbock County Jail;

c.  The policymaker for Wellpath, Defendant Hastey, was deliberately indifferent in promulgating these policies and/or permitting these *de facto* policies to persist; and

d.  Wellpath's policies and/or customs were the moving force leading to the constitutional violation of failing to protect Tony, causing his injuries and ultimately his death.

557.   Plaintiff has pleaded facts to support that Wellpath was deliberately indifferent because they disregarded known or obvious consequence of their policies and practices. Wellpath clearly knew of the policies and knew that these policies were likely to cause constitutional violations by way of the obvious nature of failing to provide a safe environment for inmates at a serious risk of suicide, as three suicides by hanging had occurred in the Lubbock County Jail in the previous year – one in the exact same cell as Tony.

558.   Wellpath's policies and practices include each policy listed in this lawsuit, which include, but are not limited to the following policies.

(1)   using inexperienced mental health professionals, such as Volpato who had only been licensed for three months and employed by Wellpath for one month to handle a complicated and complex case such as Tony's where he suffered from serious and rapidly declining mental health issues and exhibited dangerous suicidal behavior,

(2)   Failure to transport inmates, such as Tony who Wellpath understood it was incapable of providing adequate treatment, to a mental health facility or hospital where the inmate would receive adequate mental health treatment,

(3)   Failure to follow up with inmates such as Tony, who continued to exhibit ongoing mental health deterioration and repeated suicidal behavior, after those inmates were discharged from suicide watch,

(4)   taking inmates at their word when they claim not to have suicidal ideations, when their conduct clearly contradicts what is being said,

(5)   failing to supervise and train inexperienced mental health professionals such as Volpato when caring for a patient such as Tony, where he suffered from serious and rapidly declining mental health issues and exhibited dangerous suicidal behavior,

(6)   having a custom and practice of failing to properly conduct Columbia-Suicide Severity Rating Scale (C-SSRS) assessments on suicidal inmates, resulting in their discharge from suicide watch and their access to cells with ligatures and tie off points, and

(7)   having a policy that mental health personnel are not at the jail after hours and on the weekends – which is exactly when Tony hung himself.

559.   These injuries were not caused by any other means.

## COUNT IV

## RESPONDEAT SUPERIOR
## Against Defendant Wellpath, LLC

560.   Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

561.   In *Hutchison v. Brooskhire Bros.*, Ltd., 284 F. Supp. 2d 459 (E.D. Tex. 2003), the Eastern District of Texas held that *Monell* and its progeny do not shield private corporations from

vicarious liability when their employees have committed a Section 1983 violation while acting within the scope of their employment. *Hutchison*, 284 F.Supp.2d at 473.

562.    The Court reasoned that there were no persuasive policy justifications from shielding private employers from vicarious liability because imposing liability does not affect a state's police power or its ability to regulate municipalities. *Id*. at 472–73.

563.    This reasoning was recently followed by Judge Albright in the Western District of Texas, allowing claims of vicarious liability against a private medical provider. *Belknap v. Leon Cnty., Texas*, No. 622CV01028ADAJCM, 2023 WL 3612345, at *1 (W.D. Tex. May 23, 2023).

564.    As an additional and alternative theory of liability, Plaintiff pleads that Wellpath, LLC is vicariously liable for the actions and inactions of its employees, Defendants Volpato and Defendant Hastey.

## COUNT V

### Violation of The Americans with Disabilities Act
### Against Defendant Lubbock County

565.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

566.    Under Title II of The Americans with Disabilities Act (hereinafter referred to as "ADA"), "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.

567.    The ADA requires public entities to provide reasonable accommodations to qualified individuals with disabilities to enable them to benefit from the service and participate in the program or activity.

568.    The requirements for an ADA claim are: a plaintiff must show (1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability.

569.    Plaintiff is a qualified individual with a disability pursuant to the ADA because at all times relevant to this lawsuit he suffered from debilitating schizoaffective disorder: depressive type and he was substantially limited in neurological function and other major life activities such as eating, sleeping, showering, and keeping himself safe and aware of his surroundings when in the throes of depression, hallucinations, self-harming behavior, and suicidal episodes.

570.    Defendant Lubbock County denied Plaintiff benefits in that he, as a disabled inmate, was deprived of access to medical housing when he was in need of medical housing due to being in the throes of his schizoaffective disorder and exhibiting severe suicidal behavior.

571.    On June 17, 2021, Defendant Volpato noted on her suicide assessment form for Tony the following: "clinic report: inmate was refused medical housing".

572.    On the same day, Defendant Volpato discharged him from suicide watch and his violent cell restriction.

573.    As a result of being denied medical housing when he was taken off of suicide watch, Tony was placed into a general population isolation cell where he had access to a ligature and tie off point and committed suicide two days later.

574.    Additionally, the Lubbock County Jail did not employ mental health personnel to work at the Jail during after hours and on the weekends.

575.    As a result, Tony was denied access to the medical/mental health care he needed after hours and on the weekend.

576.     Tony committed suicide in a general population cell on June 19, 2021 – a Saturday – when no mental health personnel were working at the jail to ensure his safety and provide him medical/mental health care.

577.     In contrast, inmates that do not suffer from Tony's disability have access to medical care through nurses, RN's, EMT-B's, and other medical/non-mental health providers 24 hours a day, seven days a week.

578.     These medical/non-mental health providers are at the jail after hours and on the weekend.

579.     Accordingly, Defendant Lubbock County discriminated against Tony because he needed mental healthcare on June 19, 2021 as a result of his disability and Defendant Lubbock County refuses to provide mental healthcare to "qualifying individuals" like Tony during that time.

580.     The discrimination is based on Tony's disability because the policy specifically limits mental health providers from being at the jail after hours and on the weekends – opposed to all medical care providers.

581.     Tony was asking for medical housing and in need of mental health follow up care but was denied the medical housing and mental health care he needed as a result of his disability.

582.     Upon information and belief Tony was denied medical housing because his schizoaffective disorder caused him to self-harm and attempt suicide which the medical housing unit did not want to be responsible for at that time.

583.     An inmate not exhibiting self-harming and suicidal behaviors would have been granted a medical housing cell if in need.

584.     Thus, Tony was discriminated against as a result of his disability.

585.    Defendant Lubbock County's conduct was intentional and deliberately indifferent to Tony's federally protected rights.

586.    As a direct and proximate result of Defendant Lubbock County's unlawful actions, Plaintiff suffered injuries including pain and suffering, physical injury, emotional distress, and death.

## COUNT VI

### WRONGFUL DEATH
### Against All Defendants

587.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

588.    Plaintiff Leonora Rangel is Tony Martinez's mother.

589.    By reason of Defendant Lubbock County's deliberately indifferent policies, practices, and customs, which resulted in Tony's pain, suffering, and death, Defendant Lubbock County is liable for damages.

590.    By reason of Defendant Wellpath, LLC's deliberately indifferent policies, practices, and customs, which resulted in Tony's pain, suffering, and death, Defendant Wellpath, LLC is liable for damages.

591.    By reason of Defendants Volpato and Hastey's wrongful conduct of failing to protect Tony despite his clear and obvious need for protection due to his signs and symptoms demonstrating an imminent threat of serious harm without said protection, Defendants Volpato and Hastey are liable for damages.

592.    To recover on a wrongful death claim under 42 U.S.C. § 1983, a plaintiff who has standing must show both (1) the alleged constitutional deprivation required by 42 U.S.C. § 1983

and (2) the causal link between the defendant's unconstitutional acts or omissions and the death of the victim.

593.    Defendant Lubbock County's deliberate indifference, as described herein, caused the deliberate indifference shown toward Tony, which violated Tony Martinez's Constitutional rights under the Fourteenth Amendment and caused his death.

594.    Defendant Lubbock County's conduct that caused Tony's death was a producing cause of injury, which resulted in the following damages: loss of a family relationship, love, support, services, emotional pain and suffering, and Defendant Lubbock County is liable for its actions and inactions and infliction of emotional distress caused by the wrongful death of Tony.

595.    Defendant Wellpath, LLC's deliberate indifference, as described herein, caused the deliberate indifference shown toward Tony, which violated Tony Martinez's Constitutional rights under the Fourteenth Amendment and caused his death.

596.    Defendant Wellpath, LLC's conduct that caused Tony's death was a producing cause of injury, which resulted in the following damages: loss of a family relationship, love, support, services, emotional pain and suffering, and Defendant Wellpath, LLC is liable for its actions and inactions and infliction of emotional distress caused by the wrongful death of Tony.

597.    Defendants Volpato and Hastey's deliberate indifference shown toward Tony's health and safety, as described herein, violated Tony's constitutional rights under the Fourteenth Amendment and caused his death.

598.    Defendants Volpato and Hastey's conduct that caused Tony's death was a producing cause of injury, which resulted in the following damages: loss of a family relationship, love, support, services, emotional pain and suffering, and Defendants Volpato and Haste are liable for their acts and infliction of emotional distress caused by the wrongful death of Tony.

599.    Plaintiff seeks compensation as set forth more specifically in the section of this Complaint entitled "Damages."

## COUNT VII

### SURVIVAL ACTION
### Against All Defendants

600.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

601.    Plaintiff Leonara Rangel brings this claim on behalf of the estate of her son, Tony Martinez.

602.    Tony died because of the Defendants' wrongful conduct outlined in this lawsuit.

603.    Tony would have been entitled to bring this action against the Defendants if he had lived.

604.    The Decedent's right of action for wrongful conduct against the Defendants survives in favor of the estate of the deceased.

605.    The Defendants are liable to the Estate of the deceased for the loss of Tony's life, pain and suffering, and the violation of his constitutional rights.

606.    Plaintiff seeks compensation as set forth more specifically in the section of this Complaint entitled "Damages."

### V.
### PUNITIVE DAMAGES

607.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

608.     When viewed objectively from the standpoint of the Individual Defendants, at the time of the occurrence, their conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

609.     As a direct, proximate, and producing cause and the intentional, egregious, malicious conduct by the Individual Defendants, Plaintiff is entitled to recover punitive damages in an amount within the jurisdictional limits of this Court.

## VI.
## DAMAGES

610.     Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

611.     Plaintiff's injuries were a foreseeable event. Those injuries were directly and proximately caused by the Defendants' deliberate indifference shown toward Tony Martinez and their unconstitutional policies applied against Tony Martinez.

612.     As a result, Plaintiff is entitled to recover all actual damages allowed by law. Plaintiff contends the Individual Defendants' conduct constitutes malice, evil intent, or reckless or callous indifference to Tony's constitutionally protected rights. Thus, Plaintiff is entitled to punitive damages against the Individual Defendants.

613.     As a direct and proximate result of the occurrence which made the basis of this lawsuit, Plaintiff brings claims for the following damages:

a.  Actual damages;
b.  Loss of affection, consortium, comfort, financial assistance, protection, and care;
c.  Pain and suffering and mental anguish suffered by Tony prior to his death;
d.  Mental anguish and emotional distress suffered by Plaintiff;
e.  Loss of quality of life;
f.  Funeral and burial expenses;
g.  Loss of service;
h.  Loss of earnings and contributions to Plaintiff;

     i.   Prejudgment interest; and

    j.   Post judgment interest.

614.    Pursuant to 42 U.S.C. § 1983 and 1988, Plaintiff seeks to recover, and hereby requests the award of punitive damages, reasonable attorney's fees, and costs of court.

**VII.**

**ATTORNEY'S FEES**

615.    If Plaintiff prevails in this action, by settlement or otherwise, Plaintiff is entitled to and hereby demand attorney's fees under 42 U.S.C. §1988.

**VIII.**

**JURY REQUEST**

616.    Plaintiff respectfully request a jury trial.

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that judgment be rendered against Defendants, for an amount in excess of the jurisdictional minimum of this Court. Plaintiff further prays for all other relief, both legal and equitable, to which she may show herself justly entitled.

Respectfully submitted,

*/s/ Scott H. Palmer*
SCOTT H. PALMER,
Texas Bar No. 00797196

*/s/ James P. Roberts*
JAMES P. ROBERTS,
Texas Bar No. 24105721

*/s/ Breanta Boss*
BREANTA BOSS,
Texas Bar No. 24115768

SCOTT H. PALMER, P.C.
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 214.922.9900
scott@scottpalmerlaw.com
james@scottpalmerlaw.com
breana@scottpalmerlaw.com

COUNSEL FOR PLAINTIFF