UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

LEONORA RANGEL, individually and on
behalf of the Estate of Tony Martinez,

     Plaintiff,

v.

WELLPATH, LLC, et al.,

     Defendants.

No. 5:23-CV-128-H

## MEMORANDUM OPINION AND ORDER

This case stems from the tragic suicide of Tony Martinez while he was a pretrial detainee in the Lubbock County Jail. His mother, Leonora Rangel, brought suit individually and on behalf of Martinez's estate against Wellpath, LLC, the private medical provider at the jail, two Wellpath employees, and Lubbock County (the County). She asserts claims under 42 U.S.C. § 1983 and the Americans with Disabilities Act (ADA).

The County moved to dismiss the claims, arguing that the Section 1983 and ADA claims are deficient. The Court agrees as to all but one claim. First, the Court finds that the plaintiff has failed to allege facts sufficient to state a claim under Section 1983. She has failed to allege that two purported policies were official County policies and that the third policy was the moving force of the alleged constitutional violation. Second, the Court finds that one of the plaintiff's ADA claims alleging a denial of services is sufficient, but the other fails because she has not plausibly alleged that the denial was due to Martinez's disability. Third, because the plaintiff's Section 1983 claims fail, the Court dismisses her wrongful-death and survival-action claims. Finally, the Court grants the plaintiff leave to amend her complaint if she wants to attempt to remedy the deficiencies.

1.      **Factual and Procedural Background**[1]

On January 9, 2021, Tony Martinez was booked into the Lubbock County Jail.  Dkt. No. 1 ¶ 25.  That day, he told "security staff[2] that he wanted to hurt himself and was suicidal," and he "slamm[ed] his head repeatedly on the concrete floor."  *Id.* ¶ 26 (footnote added).  He was then placed on suicide watch, moved to a violent cell,[3] issued a suicide-prevention gown, and placed on 15-minute observations.  *Id.*  Martinez also reported past suicide attempts.  *Id.* ¶ 27.  A screening was conducted and revealed that he had "multiple documented mental health diagnos[e]s."  *Id.* ¶ 29.  Specifically, Martinez "had been diagnosed with schizoaffective disorder: depressive type, which presents the person with an increased risk of suicide."  *Id.* ¶ 59.  The County contracted with Wellpath, LLC, a private medical provider, to provide mental health care to inmates.  *Id.* ¶ 10.  Martinez was referred to Wellpath to receive mental health services in jail.  *Id.* ¶ 28.

---

[1] When considering a motion to dismiss, the Court "must accept as true the well-pled factual allegations in the complaint, and construe them in the light most favorable to the plaintiff." *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 766 (5th Cir. 2016) (cleaned up) (quoting *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)).

[2] The Court takes the term "security staff" to refer to Lubbock County Jail staff.  *See* Dkt. No. 1 ¶¶ 418–21.

[3] Neither the complaint nor the briefing describe the "violent cells."  However, based on the context of the complaint and arguments, it appears that the violent cells did not contain any tie-off points or ligatures.  The plaintiff alleges that:

> [Martinez] was moved from the violent cell he had been in on suicide watch to cell 102 in pod 3A.  This cell had a shower with [a] shower head sticking out from the wall a few inches from the ceiling of the shower.  [Martinez] was provided a blanket that could easily be torn into strips. On June 19, 2021, . . . [Martinez] killed himself.  [Martinez] tore the blanket into strips, tied them to the shower head, and hung himself.  The shower head was an obvious tie off point.  The blanket was an obvious ligature.

Dkt. No. 1 ¶¶ 410–16; *see also id.* ¶¶ 572–73.  Thus, the reasonable inference is that Martinez was moved from a violent cell without a tie-off point and ligature to a cell with a tie-off point and ligature, which the plaintiff alleges was the cause of his suicide.  *See id.* ¶¶ 553–55.  Comments by Wellpath and jail staff also indicate that violent cells were used "to ensure inmate safety" or keep watch on an inmate.  *See id.* ¶¶ 194, 203.

On January 10, Martinez reported feeling hopeless and a sense of being a burden to others.  *Id.* ¶ 30.  Two days later, on January 12, Wellpath employee Kimm Hastey, the mental-health coordinator at the jail, conducted a Columbia-Suicide Severity Rating Scale (C-SSRS) assessment on Martinez, marked that he denied having suicidal ideations, and discontinued his suicide watch and violent-cell restriction.  *See id.* ¶¶ 13, 16, 31–32, 37.  However, Wellpath employees allegedly had a practice and custom of incorrectly conducting the C-SSRS so they could find that the patient did not have suicidal ideations.  *Id.* ¶¶ 33–40.  That same day, Martinez self-harmed by stabbing himself in the head with a spork and ingesting two cups of cleaning solution.  *Id.* ¶¶ 44–45.  Security staff placed him back on suicide watch, issued him a suicide-prevention gown, and placed him on 15-minute observations.  *Id.* ¶¶ 43, 46.  Two days later, Hastey conducted another C-SSRS assessment, marked that Martinez denied having suicidal ideations, and discontinued his suicide watch and violent-cell restriction.  *Id.* ¶¶ 47–48, 53.

This cycle of events repeated multiple times throughout Martinez's detention.  Martinez would harm himself or make self-harming statements, security staff would place him on suicide watch, and Wellpath employees would later remove the restrictions.  On February 1, Martinez stabbed himself in the head with a pencil until he was bleeding.  *Id.* ¶ 64.  On February 10, Martinez stated "he felt like he needed to stab himself in the head and was tired of everything."  *Id.* ¶ 78.  On February 18, he stabbed himself in the head and arm until he was bloody.  *Id.* ¶¶ 91–92.  The next day, he also "put in a request for mental health services" to speak with mental-health staff about medications.  *Id.* ¶ 94.  On March 28, Martinez put in another request for mental health services to speak with a Wellpath employee about medications.  *Id.* ¶¶ 135–36.  On April 16, Martinez made self-harming

statements and began hitting his head on the cell door window. *Id.* ¶¶ 143–46. On May 2, Martinez began striking his head on a brick wall. *Id.* ¶ 173. On May 6, he swallowed a bottle cap and choked, and he later made statements that he would get security officers to kill him. *Id.* ¶¶ 193, 199–200, 215. Martinez swallowed another bottle cap on May 10. *Id.* ¶ 248. And on May 23, he swallowed a spork, stated "I'm trying to kill myself," and had to be transported to the emergency room at a hospital. *Id.* ¶¶ 263–66.

After each self-harming act or statement indicating a risk of self-harm or suicide, security staff placed Martinez on suicide watch. *See id.* ¶¶ 64–65, 78–79, 91–93, 143–46, 173–74, 203. For several of these suicide watches, security staff moved Martinez into a violent cell. *See id.* ¶¶ 143–46, 173–75, 203. After Martinez swallowed the spork, a lieutenant at the jail "put in place security measures stating that [Martinez] was 'allowed only a mattress, towel, mattress cover and bible'" and was allowed "NO eating utencil [sic]." *Id.* ¶ 274. However, each time, the complaint alleges that Wellpath mental-health employees Kimm Hastey or Gemma Volpato incorrectly conducted the C-SSRS assessment, marked that Martinez denied having suicidal ideations, and discontinued his suicide watch and any violent-cell restrictions a few days later. *See id.* ¶¶ 66, 71, 80, 85, 124, 129, 158, 163, 175, 180, 217, 222. They often did so despite noting risk factors for suicide. *See id.* ¶¶ 41, 57–59, 76, 80, 133, 184–85, 226–29. Wellpath medical staff and mental-health staff also noted on several occasions that Martinez was not taking one of his medications, and they observed multiple signs of depression in Martinez. *Id.* ¶¶ 140–42, 150, 154, 172, 277–78. However, Martinez was never transferred to a mental-health facility or hospital to receive an elevated level of mental health care and treatment. *Id.* ¶¶ 437–38.

In addition, Wellpath and the County allegedly had a policy that trained and licensed mental-health personnel were not at the jail after hours or on weekends. *Id.* ¶ 100. Thus, on weekends, suicide-watch checks were performed by Wellpath employees who were not trained or licensed in providing mental health care, rather than mental-health personnel like Hastey or Volpato. *Id.* ¶¶ 97–103, 147–49, 151–53, 300–03. The form used by one such employee for a weekend suicide-watch check states, "This form is used for after-hours/weekend checks by Nursing when Mental Health is not on site." *Id.* ¶ 98. In addition, on several occasions after Martinez was discharged from suicide watch, follow-ups with mental-health personnel were delayed because the originally scheduled date fell on a weekend. *Id.* ¶¶ 233–52, 382–84.

On June 4, Martinez told security officers over the intercom in his cell, "I am feeling suicidal and I want to hurt myself." *Id.* ¶ 283. He also banged his head on the door. *Id.* ¶¶ 286–87. Over the weekend of June 5 and 6, Martinez exhibited signs of serious mental-health decline and a serious risk of suicide, but no mental-health professionals were at the jail to observe them. *Id.* ¶¶ 297–303. On June 9, Martinez stated that he had intentions of harming himself, heard voices telling him to harm himself, and was going to bang his head on the walls. *Id.* ¶¶ 317–19. And on June 10, Martinez tied a piece of torn blanket around his neck. *Id.* ¶ 340. Security staff placed Martinez on suicide watch and in an observation cell or cell in the booking area after each self-harming act or statement. *See id.* ¶¶ 283–84, 317–21, 340. However, Volpato continued incorrectly conducting the C-SSRS assessment, indicating that Martinez denied having suicidal ideations, and discontinuing the suicide watch and violent-cell or observation-cell restrictions, despite noting risk factors. *See id.* ¶¶ 304, 309, 313–15, 321, 326, 330, 345–46, 348, 353, 358–63. When he was discharged

from suicide watch on June 14, mental-health staff noted that Martinez had reported "anxiety & depression and au/vh [auditory and visual hallucinations] telling him to hang himself and hurt himself bad."  *Id.* ¶ 368 (alteration in original) (emphasis omitted).  The next day, Martinez was still experiencing hallucinations and complained about his inability to sleep.  *Id.* ¶¶ 375–77.

On June 16, Martinez pressed the intercom button and stated, "I can't do it anymore, I'm feeling suicidal."  *Id.* ¶ 385.  He was placed on suicide watch in a violent cell.  *Id.* ¶ 387.  Volpato arrived at the cell to speak with him, and she noted that he "admitted to active suicide ideations" and "scaled a 9 on intent with 1 being he's not going to harm himself and 10 being he's going to kill himself today."  *Id.* ¶¶ 386, 388 (emphasis omitted).  However, the next day, June 17, Volpato met with Martinez again and discontinued his suicide watch and violent-cell restriction after incorrectly conducting the C-SSRS assessment.  *Id.* ¶¶ 392, 397–99.  Volpato indicated that Martinez's mood was depressed, his affect blunted, and his behavior withdrawn, and that he had risk factors of "[h]opelessness [and] feeling of guilt or worthlessness."  *Id.* ¶ 401.  However, she also indicated that he had "[n]o suicidal ideation," the date of his last self-harming incident was "unknown," he had "no plan reported," and "scaled 2 on intent."  *Id.* (emphasis omitted).  She also noted that Martinez was refused medical housing.  *Id.* ¶ 402.

June 17 was a Thursday, and per Wellpath and County policy, no mental-health professionals would be at the jail over the weekend, on June 19 or June 20.  *Id.* ¶¶ 408–09.  Martinez "was moved from the violent cell he had been in on suicide watch" to a cell with a shower head sticking out from the wall near the ceiling and was provided a blanket that could easily be torn into strips.  *Id.* ¶¶ 410–12.  Two days later, on June 19, 2021, Martinez

committed suicide by tearing the blanket into strips, tying them to the shower head, and hanging himself. *Id.* ¶¶ 413–14.

Leonora Rangel, Martinez's mother, brought this suit individually and on behalf of Martinez's estate in June 2023. Dkt. No. 1. She asserts Section 1983 claims against Volpato, Hastey, Wellpath, and Lubbock County under various theories, arguing that they violated Martinez's Fourteenth Amendment right to be protected from a known risk of suicide. *See id.* ¶¶ 439, 451–64, 466–76, 478–85, 494, 527–41, 545, 547, 551–59. She also argues that Wellpath is vicariously liable for Volpato's and Hastey's actions and inactions under a theory of respondeat superior. *Id.* ¶ 564. The plaintiff also asserts a claim under the Americans with Disabilities Act (ADA) against the County. *Id.* ¶¶ 569–86. Finally, she asserts a wrongful-death claim and a survival-action claim against all defendants. *Id.* ¶¶ 588–606.

The County moved to dismiss the claims against it under Federal Rule of Civil Procedure 12(b)(6), arguing that the plaintiff has failed to state claims under Section 1983 or the ADA. Dkt. No. 7. The motion included an appendix containing an interlocal agreement between the County and the Lubbock County Hospital District (LCHD) and a contract between LCHD and Wellpath. Dkt. No. 8. The plaintiff responded to the motion (Dkt. No. 16), and the defendant replied (Dkt. No. 20). The motion to dismiss is now ripe for consideration by the Court.

## 2.  Standard of Review

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter which, when taken as true, states 'a claim to relief that is plausible on its face.'" *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d

719, 726 (5th Cir. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In

other words, the plaintiff must plead facts "that allow[] the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it

asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*  If a

complaint pleads facts that are "'merely consistent with' a defendant's liability, it 'stops

short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting

*Twombly*, 550 U.S. at 557).

In resolving a motion to dismiss, a court must "accept all well-pleaded facts as true

and view those facts in the light most favorable to the plaintiff." *Richardson v. Axion Logistics,*

*L.L.C.*, 780 F.3d 304, 306 (5th Cir. 2015) (cleaned up) (quoting *Bustos v. Martini Club, Inc.*,

599 F.3d 458, 461 (5th Cir. 2010)).  But a court should not "accept as true conclusory

allegations, unwarranted factual inferences, or legal conclusions." *Gentilello v. Rege*, 627

F.3d 540, 544 (5th Cir. 2010) (quoting *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir.

2005)).  "Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice" for purposes of stating a plausible claim to relief.

*Iqbal*, 556 U.S. at 678.  "When there are well-pleaded factual allegations, a court should

assume their veracity and then determine whether they plausibly give rise to an entitlement

to relief." *Id.* at 679.

In considering a Rule 12(b)(6) motion, "a district court must limit itself to the

contents of the pleadings, including attachments thereto." *Collins v. Morgan Stanley Dean*

*Witter*, 224 F.3d 496, 498 (5th Cir. 2000).  If a court is presented with and does not exclude

matters outside the pleadings, it must convert the motion to a motion for summary

judgment under Rule 56.  Fed. R. Civ. P. 12(d).  However, a district court may consider certain information outside of the pleadings without converting the motion "if that evidence is either (a) a document attached to the Rule 12(b)(6) motion, referred to in the complaint, and central to the plaintiff's claim; or (b) a matter subject to judicial notice under Federal Rule of Evidence 201."  *George v. SI Grp., Inc.*, 36 F.4th 611, 619 (5th Cir. 2022).

**3.      Analysis**

The Court finds that the plaintiff has failed to plead facts sufficient to state a Section 1983 claim under either a *Monell*, conditions-of-confinement, or episodic-acts-or-omissions theory.  The Court also finds that the plaintiff has failed to state a claim under the ADA with regard to the alleged denial of medical and mental health care, but she has stated a claim with regard to the alleged denial of medical housing.  The plaintiff's failure to assert a Section 1983 claim merits the dismissal of her wrongful-death and survival-action theories as well.  However, the Court grants the plaintiff leave to amend her complaint to attempt to cure these deficiencies.

**A.      The Court does not consider the agreements proffered by the defendant in deciding the motion to dismiss.**

As an initial matter, the Court declines to consider the interlocal agreement between Lubbock County and LCHD and the contract between LCHD and Wellpath.  The County asserts in its motion to dismiss that the County did not in fact contract with Wellpath— instead, the County is party to an interlocal agreement with LCHD, and LCHD then contracted with Wellpath.  Dkt. No. 7 at 11–12.  The County attached the interlocal agreement between it and LCHD and the contract between LCHD and Wellpath to its motion to dismiss, arguing that the Court should consider the agreements as documents referred to in the complaint and central to the plaintiff's claim.  *See* Dkt. Nos. 7 at 11; 8.

The plaintiff's response does not address whether the Court should consider the agreements, but she argues that the County may still be held liable for the alleged policies if it contracts out its duty to provide medical care.  Dkt. No. 16 at 9–11.

The Court may consider the agreements without converting the motion to dismiss to a motion for summary judgment if they are "referred to in the complaint[] and central to the plaintiff's claim." *George*, 36 F.4th at 619.  The Fifth Circuit "has not articulated a test for determining when a document is central to a plaintiff's claims," but "the case law suggests that documents are central when they are necessary to establish an element of one of the plaintiff's claims." *RKCJ, LLC v. Farmers & Merchs. Bank*, No. 3:21-CV-2597-BN, 2022 WL 1050313, at *2 (N.D. Tex. Apr. 7, 2022) (quoting *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 662 (N.D. Tex. 2011)).  For example, "when a plaintiff's claim is based on the terms of a contract, the documents constituting the contract are central to the plaintiff's claim." *Id.* (quoting *Kaye*, 453 B.R. at 662).  "However, if a document referenced in the plaintiff's complaint is merely evidence of an element of the plaintiff's claim, then the court may not incorporate it into the complaint." *Id.* (quoting *Kaye*, 453 B.R. at 662).  Thus, if a document is "much more central to [the defendant's] defenses," and "[t]he plaintiffs rely on substantial, other evidence to support their claims," a district court should decline to consider the document.  *See Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 537 (5th Cir. 2003).

Here, the Court will not consider the Lubbock County–LCHD and LCHD–Wellpath agreements in deciding the motion to dismiss because they are not central to the plaintiff's claims.  The defendant argues that the contracts are central because "[t]his alleged contract between Lubbock County and Wellpath and the resulting allegations of . . . joint policies are referenced 16 times within the [p]laintiff's [c]omplaint."  Dkt. No. 7 at 11.  However, the

policy that the County failed to house Martinez in a suicide-prevention cell is alleged to be solely a County policy, not a Wellpath policy. *Compare* Dkt. No. 1 ¶¶ 16, 558, *with id.* ¶¶ 17, 553. Thus, any alleged contract with Wellpath is not necessary to prove that claim. And although the policies of not transporting inmates to another facility and not staffing mental-health personnel after hours and on weekends are alleged against both the County and Wellpath, *see id.*, these claims are not dependent on the contract. Instead, the plaintiff alleges that the Lubbock County Sheriff himself "promulgated, adopted, approved, and/or ratified the policies." *Id.* ¶ 537. This allegation would make them Lubbock County policies even without any contract between the County and Wellpath. *See infra* Section 3.B.i.b. Such a contract would merely be evidence of the plaintiff's claims regarding how the policies were promulgated. *See RKCJ, LLC*, 2022 WL 1050313, at *2. Ultimately, the contracts proffered by the County are much more central to its defenses. *See Scanlan*, 343 F.3d at 537. Thus, the Court concludes that the contracts are not central to the plaintiff's claim and declines to consider them at the motion-to-dismiss stage.

**B.    The plaintiff has failed to plausibly allege a Section 1983 claim.**

The Court finds that the plaintiff has failed to state a Section 1983 claim under either a *Monell*, conditions-of-confinement, or episodic-acts-or-omissions theory. Section 1983 provides a cause of action for plaintiffs when their constitutional or federal statutory rights are deprived by any person acting "under color of any statute, ordinance, regulation, custom, or usage" of the State. 42 U.S.C. § 1983. "A [S]ection 1983 complaint must plead specific facts and allege a cognizable constitutional violation in order to avoid dismissal for failure to state a claim." *Mills v. Crim. Dist. Ct. No. 3*, 837 F.2d 677, 678 (5th Cir. 1988). "Section 1983 is not itself a source of substantive rights; it merely provides a method for

vindicating already conferred federal rights." *Bauer v. Texas*, 341 F.3d 352, 357 (5th Cir. 2003).  To establish liability under Section 1983, a plaintiff must satisfy two elements: (1) a deprivation of a federal right, and (2) the person who deprived the plaintiff of that right acted under color of state law.  *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980).

The scope of "person" under Section 1983 includes "municipalities and other local governmental units." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  Therefore, a municipality can be sued directly and held liable for a Section 1983 violation.  *Id.* at 690–91.  However, "a municipality cannot be held liable solely because it employs a tortfeasor" or, put another way, solely on a respondeat-superior theory.  *Id.* at 691 (emphasis omitted).

Here, the plaintiff alleges that the County violated Martinez's Fourteenth Amendment right to be protected against a known risk of suicide.  Dkt. No. 1 at 2; *see also Sanchez v. Young County*, 956 F.3d 785, 791 (5th Cir. 2020).  She refers to her Section 1983 claim both as a *Monell* claim and as a conditions-of-confinement claim.  *See* Dkt. Nos. 1 ¶¶ 495–555; 16 at 6.  To state a municipal liability claim under *Monell*, a plaintiff "must plead facts that plausibly establish that '(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right.'" *St. Maron Props., L.L.C. v. City of Houston*, 78 F.4th 754, 760 (5th Cir. 2023) (quoting *Peña v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018)).  To state a conditions-of-confinement claim, a plaintiff must plead facts that plausibly establish "(1) a condition—a rule, a restriction, an identifiable intended condition or practice, or sufficiently extended or pervasive acts or omissions of jail officials—(2) that is not reasonably related to a legitimate government objective and (3) that caused the constitutional violation." *Sanchez*, 956 F.3d at 791 (cleaned up) (quoting *Duvall v. Dallas County*, 631 F.3d 203, 207 (5th Cir. 2011)).

The elements of these two theories are mostly identical.  The Fifth Circuit has observed that "[it] see[s] no meaningful difference between the[] showings" of a policy under a *Monell* theory and a condition under a conditions-of-confinement theory.  *Est. of Bonilla ex rel. Bonilla v. Orange County*, 982 F.3d 298, 308 (5th Cir. 2020) (quoting *Duvall*, 631 F.3d at 208).  Similarly, the "moving force" standard of causation, which requires a "direct causal link" and "more than . . . mere 'but for'" causation, "appears to be the same" for *Monell* and conditions-of-confinement claims.  *See id.* at 308, 311–12.  The key difference is that a *Monell* claim requires the plaintiff to show that the "municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision."  *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 411 (1997)).  In contrast, a conditions-of-confinement claim does not require the plaintiff to show that the municipality was deliberately indifferent in promulgating the condition.  *Duvall*, 631 F.3d at 207.

It is unclear whether the plaintiff is proceeding under a *Monell* claim, a conditions-of-confinement claim, or both.  Thus, the Court addresses both claims to adequately address the complaint's allegations and the parties' arguments regarding the County's policymaker and deliberate indifference.  *See* Dkt. Nos. 1 ¶¶ 537–41, 551–52; 7 at 19–21; 16 at 15–24. However, the Court finds that the plaintiff's claims ultimately fail on the elements common to both claims.

The plaintiff alleges that three policies or conditions led to Martinez's death: (1) failing to transport inmates like Martinez to a mental-health facility or hospital to receive mental health treatment when the County understood that it and Wellpath could not provide adequate treatment (the failure to transport); (2) "[f]ailing to house [Martinez] in a

cell without obvious tie off points like the shower head and ligatures like the blanket"[4] (the failure to house); and (3) "failing to ensure mental health personnel are working at the jail after hours and on the weekends . . . to provide mental healthcare to individuals like [Martinez] who suffer from a mental health disability" (the failure to staff).  Dkt. No. 1 ¶ 553.  However, the plaintiff has not sufficiently alleged that the failure to transport or the failure to house are official policies or conditions at the jail, and she has not sufficiently alleged that the failure to staff was the cause of the alleged constitutional violation.  In addition, even construed as an episodic-acts-or-omissions claim, the plaintiff has not sufficiently alleged that Lubbock County officials were deliberately indifferent to a substantial risk of serious harm.

> **i.**    **The plaintiff has failed to plausibly allege a *Monell* claim.**

The plaintiff has failed to state a claim under *Monell* because she has not sufficiently alleged that two policies at issue are official County policies or that the third policy was the cause of Martinez's suicide.  Again, a *Monell* claim requires the plaintiff to plead that "(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right."  *St. Maron Props., L.L.C.*, 78 F.4th at 760 (quoting *Peña*, 879 F.3d at 621).  To survive a motion to dismiss, a complaint's "description of a policy or custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain specific facts."  *Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997).  The Court analyzes each element in turn.

---

[4] The Court refers to a "cell without tie-off points and ligatures" as a "suicide-prevention cell."

> a. **The plaintiff has not sufficiently alleged that the failure to transport or the failure to house are official policies, but she has sufficiently alleged that the failure to staff is a policy.**

The Court finds that the plaintiff has not sufficiently alleged facts showing that that the County had policies of failing to transport inmates or failing to house Martinez in a suicide-prevention cell.  However, she has sufficiently alleged facts showing a policy of failing to staff mental-health personnel after hours and on weekends.

A municipality's official policy can be established in three ways.  First, a plaintiff can identify "written policy statements, ordinances, or regulations."  *St. Maron Props., L.L.C.*, 78 F.4th at 760.  Second, a plaintiff may allege "a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy."  *Id.*  Third, "a single decision may constitute municipal policies in rare circumstances, when the official or entity possessing final policymaking authority for an action performed the specific act that forms the basis of the [Section] 1983 claim."  *Id.*

A pattern of prior incidents can establish a practice or custom if the incidents "have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees."  *Peterson v. City of Fort Worth*, 588 F.3d 838, 850 (5th Cir. 2009) (quoting *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984) (en banc)).  The plaintiff thus must allege "a pattern of abuses that transcends the error made in a single case."  *Id.* at 850–51 (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 582 (5th Cir. 2001)). The pattern must demonstrate "similarity and specificity," or "point to the specific violation in question."  *Id.* at 851 (quoting *Est. of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005)).  And the pattern "requires 'sufficiently numerous prior

incidents,' as opposed to 'isolated instances.'" *Id.* (quoting *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989)).

The plaintiff has not pointed to any formal, written policies regarding the failure to transport or failure to house. *See* Dkt. No. 1 ¶¶ 17, 23, 410, 434–38, 553. There is also no allegation that the final policymaker—the Lubbock County Sheriff—made the specific decisions to not transport Martinez to a mental-health facility and to place him in a cell with a tie-off point and ligature before his successful suicide attempt. *See id.* ¶¶ 392–412, 434–38, 536, 554. Thus, to show that the failure to transport and house were official County policies, the plaintiff must show a widespread practice or pattern of prior incidents.

First, the plaintiff's allegations regarding the failure to transport fail to plausibly allege a policy under *Monell*. The plaintiff alleges that "[b]oth Wellpath and Lubbock County were aware that the course of action they had been following was not good enough to protect [Martinez]" and "were aware of mental health facilities and hospitals where [Martinez] could be transferred where he would receive an elevated level of care and treatment," but they "chose not to transfer [Martinez] to a facility or hospital." *Id.* ¶¶ 435–38. However, these are the only allegations regarding the County's alleged failure to transport Martinez to a different facility. *See generally* Dkt. No. 1. There are no allegations about any specific instances when the County should have known that the course of treatment was insufficient. There are no allegations of specific instances when the County refused to transport Martinez to a different facility. And, most damningly for a policy allegation, there are no allegations that the County failed to transport other inmates to mental-health facilities or hospitals when necessary. These allegations about the failure to transport are not sufficient to allege a "pattern of abuses" or "sufficiently numerous prior

incidents" and thus fail to plausibly allege an official policy.  *See Peterson*, 588 F.3d at 850–51.

Next, the Court finds that the plaintiff's allegations do not support a reasonable inference that the County had a policy of not housing Martinez in suicide-prevention cells. The plaintiff asserts that the County had a policy of "[f]ailing to house Tony [Martinez] in a cell without obvious tie off points like the shower head and ligatures like the blanket he easily ripped and used as a ligature in this case."  Dkt. No. 1 ¶ 553.  However, this claim is undermined by the other facts alleged in the complaint.  As alleged, Lubbock County jail staff placed Martinez in a "violent cell" six times over the course of his detention when he exhibited suicidal behavior.  *See* Dkt. No. 1 ¶¶ 26, 43–48, 145, 173–75, 203, 387.  Jail staff placed Martinez in an observation cell or a cell in the booking area an additional three times.  *See id.* ¶¶ 284, 317–21, 340.  On another occasion, a lieutenant at the jail placed restrictions on Martinez, allowing him "only a mattress, towel, mattress cover and bible" and "NO eating utencil [sic]," after a suicide attempt.  *Id.* ¶ 274.  The violent-cell restrictions were only removed after a Wellpath employee indicated that Martinez denied having suicidal ideations.  *See id.* ¶¶ 32, 48, 158, 175, 217, 304, 321, 348, 392.  Simply put, the plaintiff has not plausibly alleged a widespread practice or policy of not putting Martinez in a suicide-prevention cell because the County did put him in such cells, multiple times.

The plaintiff may contend that the County erred in moving Martinez out of the violent cells after Wellpath employees discontinued the restrictions.  But any such allegations are undermined by the fact that Martinez was placed in a violent cell again by jail staff when he exhibited suicidal behavior again—sometimes on the same day that the suicide watch was discontinued.  *See, e.g.*, *id.* ¶¶ 32, 43–46, 321, 340–41.  Thus, it is not

reasonable to infer that the County had a policy of failing to house Martinez in suicide-prevention cells.

These facts also are fatal to the plaintiff's alternative argument for an official policy. The plaintiff alleges that the Sheriff had constructive knowledge of the policies and violations of rights alleged in the complaint but failed to take remedial action after each prior suicide attempt by Martinez and by other inmates. *Id.* ¶¶ 538–41. She argues that this is sufficient to establish an official policy because "when the official policymaker knows about misconduct yet allegedly fails to take remedial action, this inaction arguably shows acquiescence to the misconduct such that a jury could conclude it represents official policy." Dkt. No. 16 at 22 (citing *Sanchez*, 956 F.3d at 793); *see also* Dkt. No. 1 ¶ 541. However, in *Sanchez*, the parties did not dispute that the county sheriff had actual knowledge about reports of prior violations and the details of the decedent's death. 956 F.3d at 793. Here, the plaintiff has only alleged that the Sheriff had "constructive knowledge of the customs, practices, and *de facto* policies outlined in this lawsuit, as he would have known of the violations if he would have properly exercised his responsibilities[] following each of the suicide attempts made by [Martinez] and by other inmates . . . prior to June of 2021." Dkt. No. 1 ¶ 539 (citing *Hicks-Field v. Harris County*, 860 F.3d 803, 808–09 (5th Cir. 2017)). The Court concludes that the plaintiff has not alleged sufficient facts to create a plausible inference that the Sheriff had such constructive knowledge.

A policymaker's constructive knowledge of misconduct and subsequent failure to act can be used to establish a municipal policy. *Robinson v. Midland County*, 80 F.4th 704, 710 (5th Cir. 2023). But for a policymaker to have such constructive knowledge, the plaintiff must "point[] to similar incidents that are 'sufficiently numerous'" and that have occurred

for a long time or frequently.  *See id.*  In other words, the practice must be "[p]ervasive."  *See id.* (quoting *Sanchez*, 956 F.3d at 791).  *Hicks-Field* similarly states that constructive knowledge may be inferred if the policymaker "would have known of the violations if [he] had properly exercised [his] responsibilities, as, for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or a high degree of publicity."  860 F.3d at 808–09 (quoting *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984)).  However, as discussed above, the plaintiff has not alleged a pervasive practice of County jail staff failing to house Martinez in suicide-prevention cells.  To the contrary, the allegations indicate that had the Sheriff "properly exercised his responsibilities[] following each of the suicide attempts made by [Martinez]," Dkt. No. 1 ¶ 539, he would have discovered that County staff had placed Martinez in violent cells—not that Martinez's rights were violated.  *See id.* ¶¶ 26, 43–48, 145, 173–75, 203, 387.

The Court also concludes that the three prior suicides alleged by the plaintiff are not sufficient to establish the Sheriff's constructive knowledge.  For one, the plaintiff asserts that the County's policy was failing to house Martinez specifically in a suicide-prevention cell. *See* Dkt. Nos. 1 ¶¶ 17, 553; 16 at 17–18.  Thus, only prior incidents involving Martinez are directly relevant to whether the Sheriff had constructive knowledge of the alleged policy. Nevertheless, the plaintiff has also alleged three prior incidences of suicide by hanging in the Lubbock County Jail over the course of about a year, the last of which occurred a year before Martinez's suicide.  Dkt. No. 1 ¶¶ 422–29.  In deciding whether prior incidents would give the policymaker constructive notice of a policy, "courts need to determine the size of the governmental entity at issue and the number of people potentially subject to the alleged misconduct."  *Alexander v. S. Health Partners, Inc.*, No. 3:22-CV-0395-X, 2023 WL 3961704,

at *5 (N.D. Tex. June 12, 2023) (citing *Peterson*, 588 F.3d at 851).  This includes information like how many inmates a jail houses and how many inmates passed through the jail in the period indicated by the plaintiff.  *Id.*  However, the plaintiff has provided no such information.  *See generally* Dkt. No. 1.  Without this context, the Court cannot determine whether three incidents are sufficiently numerous to attribute constructive knowledge of the failure to house to the Sheriff.  *See Alexander*, 2023 WL 3961704, at *5.

There are also factual differences between Martinez's suicide and the prior suicides.  A pattern that gives rise to constructive notice requires "similarity and specificity."  *See Peterson*, 588 F.3d at 850–51.  But two inmates committed suicide using jail clothing as a ligature, Dkt. No. 1 ¶¶ 423, 425, and the other used an oxygen machine cord, *id.* ¶ 428, while Martinez used a blanket, *id.* ¶ 414.  And the two inmates who used jail clothing are also only alleged to have "exhibited mental health problems in the jail prior to [their] suicide[s]."  *Id.* ¶¶ 424, 427.  However, courts are "reluctan[t] to hold that generalized evidence of an inmate's mental illness invariably indicates a substantial risk of self-harm."  *Est. of Bonilla*, 982 F.3d at 306.  The differences between the prior suicides and Martinez's suicide make it less plausible that the prior incidents gave the Sheriff constructive notice of any policy.  In particular, these suicides were not evidence of a policy of putting suicidal inmates in non-suicide-prevention cells because these prior inmates were not obviously suicidal.  Thus, the Court finds that the plaintiff has not plausibly alleged that the Sheriff had notice of the failure to house, and she cannot establish that it was an official County policy.

In contrast, the plaintiff has pled sufficient facts to allege that the failure to staff was an official policy.  The plaintiff asserts that the County had a policy of "failing to ensure

mental health personnel are working at the jail after hours and on the weekends . . . to provide mental healthcare to individuals like [Martinez] who suffer from a mental health disability." Dkt. No. 1 ¶ 553. She alleges that on weekends, suicide-watch checks were performed by Wellpath employees who were not trained or licensed in providing mental health care, instead of by mental-health personnel like Hastey or Volpato. *Id.* ¶¶ 97–103, 147–49, 151–53, 300–03. The form used by one such employee for a weekend suicide-watch check states, "This form is used for after-hours/weekend checks by Nursing when Mental Health is not on site." *Id.* ¶ 98. The plaintiff also alleges that on several occasions after Martinez was discharged from suicide watch, follow-ups with mental-health personnel were delayed because the originally scheduled date fell on a weekend. *Id.* ¶¶ 233–52, 382–84. Finally, the plaintiff asserts that Martinez did not have access to mental-health personnel over the weekends. *Id.* ¶¶ 295–99, 342–45, 413.

The form's written acknowledgement that "after-hours/weekend checks" are performed "by Nursing when Mental Health is not on site," *id.* ¶ 98, makes it plausible that there is a formal, written policy indicating that mental-health personnel are not at the jail at those times. Admittedly, the plaintiff does not make any specific allegations about prior incidents where the absence of mental-health personnel affected other inmates. But her allegations do point to a pattern of mental-health personnel not being available at the jail on several weekends over the course of Martinez's detention. Such a "pattern of failures" over the course of an inmate's detention may be sufficient to draw the reasonable inference of an unwritten policy or widespread practice. *See Balle v. Nueces County*, 952 F.3d 552, 559–60 (5th Cir. 2017); *cf. Shepherd v. Dallas County*, 591 F.3d 445, 453 (5th Cir. 2009) (concluding in the conditions-of-confinement context that evidence of "inadequate treatment [the plaintiff]

– 21 –

received in a series of interactions with the jail's medical system," in part due to understaffing, supported the existence of a condition). The plaintiff also alleges that the failure to staff meant that care was not provided to "individuals like [Martinez] who suffer from a mental health disability." *Id.* ¶ 553. The Court finds that these allegations are sufficient to create a reasonable inference that the alleged failure to staff was an official County policy that affected other inmates.

In sum, the plaintiff has not alleged a pattern of prior incidents showing that the failure to transport Martinez to a mental-health facility or hospital or the failure to house Martinez in a suicide-prevention cell were official policies. The County thus cannot be held liable for those policies under *Monell*. However, the plaintiff has sufficiently alleged an official policy of failing to staff mental-health personnel at the jail after hours and on weekends. Accordingly, the Court analyzes the remaining *Monell* elements as to the failure to staff only.

### b.    The plaintiff has sufficiently alleged that the municipal policymaker promulgated the staffing policy.

The Court finds that the plaintiff has plausibly alleged that the Lubbock County Sheriff promulgated the staffing policy. For the second element of a *Monell* claim, a plaintiff must allege that the policy in question was promulgated by the municipal policymaker. *St. Maron Props., L.L.C.*, 78 F.4th at 760. A policymaker is "the governing body of the municipality or . . . an official to whom that body has delegated policy-making authority," and the policymaker must have "[a]ctual or constructive knowledge of [the] custom" or policy. *Valle*, 613 F.3d at 542 (second alteration in original) (quoting *Webster*, 735 F.2d at 842). Whether an official is a policymaker for purposes of municipal liability is a question of state and local law. *Id.* "Under Texas law, sheriffs are 'final policymakers' in the area of

– 22 –

law enforcement for the purposes of holding a county liable under [Section] 1983." *James v. Harris County*, 577 F.3d 612, 617 (5th Cir. 2009).

The plaintiff alleges that "Kelly Rowe is the sheriff of Lubbock County and was the sheriff of Lubbock County at all times relevant to this lawsuit" and that "[u]pon information and belief, discovery into information within the knowledge of the County will show that Sheriff Rowe promulgated, adopted, approved, and/or ratified the policies and practices discussed in this lawsuit." Dkt. No. 1 ¶¶ 535, 537. The plaintiff has alleged enough facts to make this a reasonable inference. Under Texas law, "[t]he sheriff of each county is the keeper of the county jail" and "shall safely keep all prisoners committed to the jail by a lawful authority." Tex. Loc. Gov't Code Ann. § 351.041(a). "The sheriff may appoint a jailer to operate the jail and meet the needs of the prisoners, but the sheriff shall continue to exercise supervision and control over the jail." *Id.* § 351.041(b). The plaintiff asserts that Lubbock County operated the jail and "contracted with Wellpath . . . to provide mental health care to people incarcerated in the Lubbock County Jail."[5] Dkt. No. 1 ¶¶ 9–10. Here, it is reasonable to infer that, as part of his statutory duties in supervising and controlling the jail, the Sheriff would have actual knowledge of staffing policies. The plaintiff has also pointed to numerous instances where mental-health personnel were not at the jail on weekends, which could provide the Sheriff with constructive knowledge of such a policy. *See Robinson*, 80 F.4th at 710.

The underlying argument in the defendant's motion to dismiss is that this policy is not a Lubbock County policy due to the contractual relationships between the County and

---

[5] Because the Court declines to consider the contract between LCHD and Wellpath, *see supra* Section 3.A, the Court takes the plaintiff's allegations that the County contracted with Wellpath as true. *See Richardson*, 780 F.3d at 306.

Wellpath.  *See* Dkt. No. 7 at 12–14.  And the plaintiff does allege that the County "delegated policymaking authority to Wellpath regarding the medical policies, practices, and procedures in the Lubbock County Jail, including mental health care."  Dkt. No. 1 ¶ 11.  However, the County may still be held liable under Section 1983 for said policies.  *See Rodriguez v. S. Health Partners, Inc.*, No. 3:20-CV-0045-D, 2020 WL 7056336, at *13 (N.D. Tex. Dec. 2, 2020) (Fitzwater, J.).  The Supreme Court has indicated that "there will be cases in which policymaking responsibility is shared among more than one official or body."  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988).  And if "a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, [Section] 1983 could not serve its intended purpose."  *Id.*  Thus, courts in this district have concluded that a county's delegation of policymaking authority to a private healthcare provider does not necessarily preclude the county from liability under Section 1983.  *Rodriguez*, 2020 WL 7056336, at *13.

At the very least, the plaintiff's allegations provide "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" that the Sheriff had actual or constructive knowledge of the mental-health personnel staffing policies.  *See In re S. Scrap Material Co.*, 541 F.3d 584, 587 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).  Thus, the Court concludes that the plaintiff has sufficiently alleged that the municipal policymaker promulgated and had actual or constructive knowledge of the staffing policy.

### c.   The plaintiff has not sufficiently alleged that the failure to staff was the moving force behind the constitutional violation.

Despite the above conclusions, the plaintiff's *Monell* claim fails on the final element because she has not plausibly alleged that the staffing policy was promulgated with

deliberate indifference and was the actual cause of the failure to protect Martinez.  *Monell* liability requires that the challenged policy be the "moving force" behind the alleged constitutional violation.  *St. Maron Props., L.L.C.*, 78 F.4th at 760.  Ultimately, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  *Valle*, 613 F.3d at 542 (quoting *Brown*, 520 U.S. at 404).

The culpability element requires the plaintiff to sufficiently allege "either that the policy itself was unconstitutional or that it was adopted with deliberate indifference to the 'known or obvious fact that such constitutional violations would result.'"  *Webb v. Town of Saint Joseph*, 925 F.3d 209, 219 (5th Cir. 2019) (footnote omitted) (quoting *Shumpert v. City of Tupelo*, 905 F.3d 310, 316–17 (5th Cir. 2018)).  Deliberate indifference can be shown by demonstrating "a pattern of similar violations" arising from a policy "that is so clearly inadequate as to be 'obviously likely to result in a constitutional violation.'"  *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003) (quoting *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001)).  A single incident may also show deliberate indifference, under a "narrow" exception to the requirement of a pattern, if "the facts giving rise to the violation are such that it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of a particular policy."  *Id.* at 373.  "[A] showing of simple or even heightened negligence will not suffice."  *Valle*, 613 F.3d at 542 (quoting *Piotrowski*, 237 F.3d at 579).

The Court finds that the plaintiff has not sufficiently alleged municipal deliberate indifference with regard to the failure to staff.  Although the plaintiff has alleged three prior suicides by hanging in the jail, there is no allegation that the failure to have mental-health

personnel at the jail after hours or on weekends contributed to those past incidents at all. *See* Dkt. No. 1 ¶¶ 422–31.  Indeed, as the defendant notes, none of the past suicides occurred on a weekend.  Dkt. No. 7 at 22.  In other words, the plaintiff has not shown that the alleged past constitutional violations arose from this policy, so those deaths do not indicate that the County was deliberately indifferent in adopting this policy.  *See Burge*, 336 F.3d at 370.

Nor does the single-incident exception apply here.  Martinez's successful suicide attempt was not the "highly predictable consequence" of not having mental-health personnel on site over the weekend.  The plaintiff alleges that Volpato indicated that Martinez "scaled 2 on intent" and had "[n]o suicidal ideation," no behaviors of concern, and "no plan reported."  Dkt. No. 1 ¶ 401 (emphasis omitted).  Volpato made the choice to discontinue Martinez's suicide watch and violent-cell restriction.  *Id.* ¶ 392.  And there are no allegations as to any facts between Martinez's removal from suicide watch and his successful suicide attempt that would have made his attempt obvious.  *See id.* ¶¶ 407–17.  Under these facts, it was not highly predictable or obvious to the Sheriff that not having mental-health staff available to Martinez that weekend would result in a failure to protect him from his suicidal tendencies.

Lastly, the plaintiff has not sufficiently alleged that the failure to staff was the actual cause of the alleged failure to protect Martinez from a known risk of suicide.  The second component of the moving-force element requires the plaintiff to "establish a 'direct causal link' between the municipal policy and the constitutional injury."  *Valle*, 613 F.3d at 546 (quoting *Brown*, 520 U.S. at 404).  "[T]he connection must be more than a mere 'but for' coupling between cause and effect"—the policy "must be the actual cause of the

constitutional violation." *Id.* (quoting *Thompson v. Connick*, 578 F.3d 293, 300 (5th Cir. 2009), *rev'd on other grounds*, 563 U.S. 51 (2011)); *see also Est. of Bonilla*, 982 F.3d at 309, 311–12. However, the plaintiff has failed to plead facts establishing such causation.

The plaintiff argues that "[Martinez] committed suicide on the date that he did—on June 19, 2021, a weekend" in part because of "the lack of mental health providers at the jail on the weekend who[m] he could have spoken to instead of committing suicide." Dkt. No. 16 at 24. However, the Court finds that this is insufficient to plausibly allege that the failure to staff was a moving force. The plaintiff has not shown that the County's failure to staff was the but-for cause of the failure to protect Martinez from a known risk of suicide, much less a more-than-but-for cause. There are no allegations that Martinez requested mental health care before his successful suicide attempt but did not receive it due to it being a weekend. *See* Dkt. No. 1 ¶¶ 407–17; *cf. Bonilla*, 982 F.3d at 311 (finding no causation in part because the decedent had not asked for the medication that was allegedly wrongfully withheld). There are also no allegations that Martinez exhibited any behavior prior to his suicide that would have alerted mental-health personnel that he needed care or additional protection had personnel been at the jail. *See* Dkt. No. 1 ¶¶ 407–17. Thus, even if mental-health personnel had been staffed at the jail that weekend, the plaintiff has not demonstrated that they would have adequately protected Martinez from his suicide attempt. In fact, the plaintiff has repeatedly alleged that the mental-health staff had been deficient in treating Martinez and had "deliberately ignored . . . obvious facts indicating [Martinez] was a suicide risk . . . the entire time [they were] responsible for his mental health care." *See, e.g.*, *id.* ¶¶ 16, 276, 403–04. As a result, there is no reasonable inference that the lack of mental-health personnel actually caused the alleged constitutional violation.

In addition, the mere possibility that Martinez "could have spoken to" mental-health personnel, *see* Dkt. No. 16 at 24, is speculative and does not elevate the failure to staff to a moving force.  Martinez did request mental health services on two occasions during his detention, on February 19 and March 28.  Dkt. No. 1 ¶¶ 94, 135–36.  Thus, he could have requested services again between June 17 and June 19.  But without any factual allegations that he did in fact request services, there is no "direct causal link" between the failure to staff and the alleged failure to protect Martinez on those days.  The speculation that the presence of mental-health professionals at the jail *might* have prevented Martinez's suicide does not provide a basis to plausibly find that their absence was the actual cause of his suicide.

Thus, although the plaintiff has sufficiently alleged that the County had a policy of not staffing mental-health personnel after hours and on weekends and that the Sheriff had actual or constructive knowledge of the policy, she has not sufficiently alleged that the policy was the moving force behind the failure to protect Martinez.  Thus, her *Monell* claim against the County is dismissed.

### ii. The plaintiff has failed to plausibly allege a conditions-of-confinement claim.

For the same reasons the plaintiff's *Monell* claim fails, her conditions-of-confinement claim falls short.  A conditions-of-confinement claim challenges the "general conditions, practices, rules, or restrictions of pretrial confinement."  *Sanchez*, 956 F.3d at 791 (quoting *Hare v. City of Corinth*, 74 F.3d 633, 644 (5th Cir. 1996) (en banc)).  "The issue is whether the conditions 'amount to punishment'" before conviction.  *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)).  To state such a claim, a plaintiff must plead facts that plausibly establish that (1) a condition (2) that is not reasonably related to a legitimate government objective (3) caused the constitutional violation.  *Id.*  In particular, the Fifth Circuit has stated that

"isolated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate." *Shepherd*, 591 F.3d at 454.  A plaintiff challenging jail conditions must allege "a pervasive pattern of serious deficiencies in providing for [the detainee's] basic human needs; any lesser showing cannot prove punishment in violation of the detainee's Due Process rights." *Id.*

Because the Fifth Circuit has observed that the conditions-of-confinement elements of a condition and causation are nearly identical to the *Monell* elements of a policy and a moving force, the deficiencies in the plaintiff's *Monell* claim are also fatal to her conditions-of-confinement theory.  *See Est. of Bonilla*, 982 F.3d at 308, 311–12.  The plaintiff has not sufficiently alleged that the failure to transport or failure to house were conditions of confinement because she has not shown that that they were "sufficiently extended or pervasive acts or omissions of jail officials." *See supra* Section 3.B.i.a; *Sanchez*, 956 F.3d at 791 (cleaned up) (quoting *Duvall*, 631 F.3d at 207).  And she has not plausibly alleged a pervasive pattern of the County failing to provide for Martinez's basic human needs.  To the contrary, she has alleged that Lubbock County jail staff moved Martinez into a violent cell and issued restrictions for his safety on multiple occasions.  *See supra* Section 3.B.i.a.  The plaintiff has also failed to allege facts showing that the failure to staff was a more-than-but-for cause of the alleged failure to protect Martinez from a known risk of suicide.  *See supra* Section 3.B.i.c; *Est. of Bonilla*, 982 F.3d at 308, 311–12.  As a result, the Court finds that the plaintiff has not sufficiently alleged a conditions-of-confinement claim.

The Court also notes that the plaintiff has not alleged or argued that any of the identified policies are not reasonably related to a legitimate government objective.  *See generally* Dkt. No. 1 ¶¶ 495–555.  This is especially problematic for the failure to staff, since

such a policy does not seem to be "arbitrary or purposeless." *Cf. Shepherd*, 591 F.3d at 452 (quoting *Bell*, 441 U.S. at 539). Thus, the plaintiff has also failed to meet the second element of a conditions-of-confinement claim.

In short, the plaintiff has failed to state a conditions-of-confinement claim. She has not alleged facts showing that the failure to transport or failure to house were conditions in the Lubbock County jail. She also has not alleged facts showing that the failure to staff was not reasonably related to a legitimate government interest and was the cause of the alleged constitutional violation. Accordingly, the plaintiff's conditions-of-confinement claim against the County is dismissed.

### iii.   The plaintiff has failed to plausibly allege an episodic-acts-or-omissions claim.

Finally, even if the Court were to construe the plaintiff's allegations as an episodic-acts-or-omissions claim against the County for the acts of its officials,[6] that claim is also deficient. Under an episodic-acts-or-omissions theory, "a plaintiff must show '(1) that the municipal employee violated [the pretrial detainee's] clearly established constitutional rights with subjective deliberate indifference; and (2) that this violation resulted from a municipal policy or custom adopted and maintained with objective deliberate indifference.'" *Cadena v. El Paso County*, 946 F.3d 717, 727 (5th Cir. 2020) (alteration in original) (quoting *Brumfield v.*

---

[6] One paragraph of the complaint states, "Plaintiff invokes two alternative theories of liability against Victoria County [sic] for the death of Zachariah [sic]: the 'episodic acts and omissions' of County jailers, and the unconstitutional 'conditions of confinement' at the County jail." Dkt. No. 1 ¶ 480. However, the following sections of the complaint allege "Episodic Acts or Omissions Claim against Defendant Wellpath, LLC" and "Conditions of Confinement Claims Against Defendants Lubbock County and Wellpath." *Id.* at 66, 68. The episodic-acts-or-omissions section solely discusses the actions of Wellpath's employees and Wellpath's policies. *Id.* ¶¶ 486–94. However, out of an abundance of caution, the Court also analyzes a potential episodic-acts-or-omissions theory. *See Sanchez*, 956 F.3d at 792 (noting that the district court should have examined a claim pled as a conditions-of-confinement claim as an episodic-acts-or-omissions claim).

*Hollins*, 551 F.3d 322, 331 (5th Cir. 2008)).  The jail official must have "had 'subjective knowledge of a substantial risk of serious harm' to the detainee and responded to that risk with deliberate indifference."  *Est. of Henson v. Wichita County*, 795 F.3d 456, 464 (5th Cir. 2015) (quoting *Hare*, 74 F.3d at 650).  Subjective knowledge requires that the official be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and then actually "draw the inference."  *Id.* (quoting *Est. of Henson v. Krajca*, 440 F. App'x 341, 343 (5th Cir. 2011)).

Here, the plaintiff has alleged that County jail staff were aware of facts giving rise to an inference of a substantial risk of serious harm.  She argues that "[t]he Lubbock County Jail was on notice that [Martinez] had previously tied a ligature around his neck necessitating suicide watch as security staff are the ones that found him and placed him on suicide watch" and that staff "were aware of [Martinez's] suicidal behavior as he ha[d] been attempting suicide in their jail since January 9, 2021."  Dkt. No. 1 ¶¶ 418, 421.

However, the plaintiff does not allege that the particular Lubbock County officers who failed to transport Martinez and housed him in a non-suicide-prevention cell actually drew the inference that there was a substantial risk of serious harm to him.  *See id.* ¶¶ 410–33, 551–55.  And several facts in the complaint make it implausible that they did so.  For one, a mental-health professional discontinued Martinez's suicide watch and violent-cell restriction after indicating that he "scaled 2 on intent" and had "[n]o suicidal ideation," no behaviors of concern, and "no plan reported."  *Id.* ¶¶ 392, 401 (emphasis omitted).  Although the plaintiff argues that this decision was in error, she does not allege that the County officers knew it was improper, making it implausible that the officers were actually aware of a substantial risk of suicide at that time.  And again, there are no allegations of any

conduct between Martinez's removal from suicide watch and his successful suicide attempt that would have made those officers actually draw the inference of a substantial risk of serious harm.  *See id.* ¶¶ 407–17.  Thus, there is not a plausible allegation that Lubbock County officers actually drew the inference of a substantial risk of suicide and then were deliberately indifferent to it.  As a result, insofar as the plaintiff's Section 1983 claim against the County relies on an episodic-acts-or-omission theory, the claim is dismissed.

### C.  The plaintiff has sufficiently alleged an ADA claim based on the denial of medical housing, but she has not alleged a claim based on the denial of medical or mental health care.

Next, the Court finds that the plaintiff has sufficiently alleged a claim under the Americans with Disabilities Act (ADA) on one of her theories, but not the other.  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Such public entities include local governments and their instrumentalities, such as county jails.  *Id.* § 12131(1)(A)–(B); *Smith v. Harris County*, 956 F.3d 311, 317 (5th Cir. 2020).  To state a claim under the ADA, a plaintiff must show:

> (1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability.

*Smith*, 956 F.3d at 317 (quoting *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004)).

The plaintiff alleges that Martinez was a qualified individual because "he suffered from debilitating schizoaffective disorder: depressive type and he was substantially limited

– 32 –

in neurological function and other major life activities." Dkt. No. 1 ¶ 569. The County does not seek dismissal of the claim based on this element. *See* Dkt. No. 7 at 29. Next, the plaintiff alleges that Martinez was denied the benefit of services in two ways: (1) he was denied medical housing after he was taken off of suicide watch; and (2) he "was denied access to the medical/mental health care he needed after hours and on the weekend," and "he needed mental healthcare on June 19, 2021[,] as a result of his disability and [d]efendant Lubbock County refuses to provide mental healthcare to 'qualifying individuals' like [Martinez] during that time." Dkt. No. 1 ¶¶ 570–73, 575, 579. Then, the plaintiff asserts that these denials were by reason of Martinez's disability because (1) "[u]pon information and belief [Martinez] was denied medical housing because his schizoaffective disorder caused him to self-harm and attempt suicide which the medical housing unit did not want to be responsible for at that time"; and (2) County "policy specifically limits mental health providers from being at the jail after hours and on the weekends—[as] opposed to all medical care providers." *Id.* ¶¶ 580, 582.[7]

As to the denial of medical housing, the County argues that the plaintiff's allegation that the denial was by reason of Martinez's disability is "too conclusory to properly state a causal analysis." Dkt. No. 7 at 29. The Court disagrees. Pleadings based on information and belief "are generally deemed permissible under the Federal Rules, especially in cases in which the information is more accessible to the defendant." *Johnson v. Johnson*, 385 F.3d 503, 531 n.19 (5th Cir. 2004). Often, "permitting allegations on information and belief is a

---

[7] Although the plaintiff cites the proposition that the ADA also requires public entities to provide reasonable accommodations for qualified individuals with disabilities, *see* Dkt. No. 1 ¶ 567, she does not plead or argue that the County failed to reasonably accommodate Martinez—only that it denied him the benefits of services, *see id.* ¶¶ 568–86.

practical necessity" and should be allowed "when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff but [she] has sufficient data to justify interposing an allegation on the subject." 5 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1224 (4th ed. Apr. 2023 update). Accordingly, "the *Twombly* plausibility standard does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability probable." *Innova Hosp.*, 892 F.3d at 730 (cleaned up) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)).

Here, the plaintiff has alleged that Martinez requested medical housing but was denied it. Dkt. No. 1 ¶¶ 402, 581. She has also alleged that, upon information and belief, Martinez was denied medical housing because the medical housing unit did not want to be responsible for his self-harm or suicide attempts and that an inmate not exhibiting those behaviors would have been granted a medical housing cell if in need. *Id.* ¶¶ 582–83. Her other factual allegations also give rise to the reasonable inference that the refusal of medical housing occurred around the same time Martinez's mental-health problems were worsening. The refusal was noted by Volpato on June 17, *see id.* ¶¶ 392, 402, and Martinez had been hearing voices and tied a piece of blanket around his neck earlier that month, *see id.* ¶¶ 318, 340, 368, 375–76. The reasons behind the denial of medical housing are "peculiarly within the possession and control of the defendant," *see Innova Hosp.*, 892 F.3d at 730 (quoting *Arista Records, LLC*, 604 F.3d at 120), and these allegations "raise a reasonable expectation that discovery will reveal evidence" about the reasons for the refusal, *see In re S. Scrap Material Co.*, 541 F.3d at 587 (quoting *Twombly*, 550 U.S. at 556). Thus, the plaintiff's

– 34 –

allegation that the denial of medical housing was by reason of Martinez's disability is not conclusory, and the Court must accept it as true in resolving the current motion. As a result, the plaintiff has sufficiently stated an ADA claim as to the refusal of medical housing.

As to the denial of medical and mental health care, the Court finds that the plaintiff has not sufficiently alleged that Martinez was denied care "by reason of" his disability. The plaintiff has established the lack of mental health care after hours and on weekends. *See supra* Section 3.B.i.a. But as alleged by the plaintiff herself, the lack of access to medical and mental health care after hours and on the weekends was "[a]s a result" of the "policy" that "the Lubbock County Jail did not employ mental health personnel to work at the Jail . . . after hours and on the weekends." *See* Dkt. No. 1 ¶¶ 574–75, 580. In other words, Martinez was not denied mental health care on the weekends because of his disability—he was denied care from a mental-health professional on the weekends because no one in the jail received mental health care on the weekends. Even if he were not disabled, he would not have been able to see a mental-health professional on the weekend. In addition, Martinez did receive medical attention on the weekends from the Wellpath medical staff who performed suicide-watch checks. *See id.* ¶¶ 97, 101, 147, 151, 301. As a result, the plaintiff has not stated an ADA claim as to the denial of medical and mental health care.

The Court finds that the plaintiff has sufficiently pled an ADA claim regarding the refusal of medical housing. However, the plaintiff has not sufficiently pled that the failure to provide medical or mental health care after hours and on the weekends violated the ADA, and that claim is dismissed.

– 35 –

**D.** **The plaintiff has not sufficiently alleged claims for wrongful-death or survival-action damages under Section 1983.**

Finally, the Court construes the plaintiff's wrongful-death and survival-action claims as theories for damages under Section 1983 and finds that those theories must fail. The complaint discusses the legal standard "[t]o recover on a wrongful death claim under 42 U.S.C. § 1983," and it does not cite any state law provisions for the wrongful-death and survival-action claims. *See id.* ¶¶ 587–606. In addition, the County did not treat these claims as separate causes of action in its motion to dismiss all claims against it, and the plaintiff did not contest that characterization in its response. *See* Dkt. Nos. 7; 16.[8]

In the Fifth Circuit, Sections 1983 and 1988 incorporate state wrongful-death and survival statutes "to provide full remedies for violations of constitutional rights." *Rhyne v. Henderson County*, 973 F.2d 386, 390–91 (5th Cir. 1992). Thus, "civil rights plaintiffs in Texas may recover for their own injuries and the injuries of a deceased person resulting from the constitutional violations of government actors if the plaintiffs are the surviving spouse, children, parents, heirs, legal representatives, or estate of the deceased." *De Paz v. Duane*, 858 F. App'x 734, 737–38 (5th Cir. 2021). However, a plaintiff still must establish a county's liability to recover against the county under Sections 1983 and 1988. *See Rhyne*, 973 F.3d at 391–92. Thus, because the plaintiff has not successfully pled her Section 1983

---

[8] To the extent that the plaintiff did intend to assert these as state-law claims, the Court notes that Lubbock County is a governmental unit shielded by sovereign immunity. *See Duffie v. Wichita County*, 990 F. Supp. 2d 695, 717 (N.D. Tex. 2013). The Texas Tort Claims Act only waives sovereign immunity for the clearly defined areas enumerated in the Act. *Id.* And the Fifth Circuit has recognized that the Texas wrongful-death statute does not waive governmental immunity for units of Texas government. *See Saenz v. City of McAllen*, 396 F. App'x 173, 179 (5th Cir. 2010) (citing Tex. Civ. Prac. & Rem. Code Ann. §§ 71.001–.002). The plaintiff does not argue that sovereign immunity has been waived in any other way.

claims against Lubbock County, *see supra* Section 3.B, she cannot recover wrongful-death or survival-action damages under Section 1983.

   E.   **The Court grants the plaintiff leave to amend her complaint.**

   Although the Court finds that the plaintiff's Section 1983 claims and one of her ADA claims should be dismissed, there is a strong policy in favor of granting leave to amend. *See Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002). Thus, district courts often allow plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case. *Id.* The plaintiff has not previously been given an opportunity to amend. And she has requested leave to amend should the Court find there are deficiencies in her complaint. Dkt. No. 16 at 29. Accordingly, the Court dismisses the aforementioned claims without prejudice and grants the plaintiff 14 days from the date of this Order to file a first amended complaint should she choose to do so.

## 4.   Conclusion

   In sum, the plaintiff has failed to plead her Section 1983 claims. Her claims under both *Monell* and conditions-of-confinement theories fail because she has not sufficiently alleged a policy or condition as to two of her theories and has not sufficiently alleged that the third was the moving force behind the alleged constitutional violation. And even construed under an episodic-acts-or-omissions theory, the plaintiff has not alleged that County officials were deliberately indifferent. As a result, her wrongful-death and survival-action theories also fail. The plaintiff also has failed to state an ADA claim as to the denial of medical or mental health care because she has not shown that the denial was by reason of Martinez's disability. However, she has sufficiently pled her ADA claim based on the denial of medical housing.

Thus, the Court grants in part and denies in part Lubbock County's motion to dismiss (Dkt. No. 7). All claims against Lubbock County except the medical-housing ADA claim are dismissed without prejudice. Because of the strong policy in favor of granting leave to amend at least once, the Court grants the plaintiff leave to amend her complaint within 14 days from the date of this Order.

So ordered on March 18, 2024.

_____
JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE